James C. Hazelton and Alice K. Hazelton, husband and wife v. Commissioner.
Hazelton v. Commissioner
Docket No. 36565.
United States Tax Court
1953 Tax Ct. Memo LEXIS 298; 12 T.C.M. (CCH) 398; T.C.M. (RIA) 53123; April 15, 1953
John D. Smyers, Esq., for the petitioners. Robert J. McDonough, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The petitioners attack the following deficiencies in income tax determined by the respondent: 1944
$ 43.75
1946
881.01
1947
1,571.70
The petitioners allege as error the respondent's inclusion in taxable income in the years in question of amounts representing the difference between the price paid and the fair market value of shares of stock of Henry Holt and Company, Incorporated, (hereafter called the Company) purchased from the Company by one of the petitioners who was an employee of the Company. Findings of Fact A stipulation of facts filed by the parties *299 is adopted as part of our findings. The petitioner James C. Hazelton will be referred to hereafter as the petitioner. The petitioners are husband and wife residing in Western Springs, Illinois. They filed joint income tax returns for the years in question with the collector for the first district of Illinois. The petitioner has been employed by the Company since before 1938. In 1944 he was employed as Assistant Branch Manager of the Chicago office. At the beginning of that year his salary was $4,200 per annum and on September 1, 1944, this was increased to $6,000. The Company was incorporated in 1928 to take over the book publishing business originally established in 1858 by Henry Holt. During the decade 1930 to 1940 the Company was unable to pay the dividends due on its preferred stock and in 1943 these arrearages amounted to $12.45 per share. In 1943 the Company was experiencing difficulty in keeping its younger executives, some of whom had more attractive offers from competitors due, in part, to the shortage of qualified men in the publishing field resulting from war time employment conditions. In 1944 the Company was recapitalized to eliminate the preferred dividend *300 arrearages. The recapitalization plan contained a provision setting aside 16,000 of 150,000 shares of common stock for future sale to employees and officers. The primary purpose of this provision was to retain the services of the Company's more promising junior executives. On July 11, 1944, the Company's directors authorized the sale of 1,000 shares of its common stock to the petitioner at a price of $1.75 per share. A portion of the minutes of the meeting at which this action was authorized follows: "The Chairman then suggested that this Board consider designating officers and employees of this Company who should be entitled to purchase from this Company all or any part of the 16,000 shares of Common Stock of this Company which are available for purchase by officers and employees of this Company pursuant to its Plan of Recapitalization approved February 25, 1944, and the terms upon which such shares may be sold to such officers and employees; and stated that no offer had heretofore been made on behalf of this Company to any of its officers or employees whereby any of them would be entitled to purchase from this Company any of said shares of stock. "After further discussion and *301 on motion duly made, seconded and carried, the following resolution was unanimously adopted: "RESOLVED that the proper officers of the Company be and they hereby are authorized, empowered and directed, on behalf of this Company, to offer to sell to each of the officers and employees of this Company hereinafter named in this resolution, from time to time during the three year period ended June 30, 1947, all or any part of approximately the number of shares of Common Stock of this Company, in the aggregate, hereinafter set opposite his name in this resolution, out of the 16,000 shares of Common Stock of this Company reserved for sale to officers and employees of this Company pursuant to its Plan of Recapitalization approved February 25, 1944, at a price of $1.75 per share, payable in cash in each instance upon written notification from him to this Company of the number of said shares of stock which he desired to purchase; and that the names of each of said officers and employees, the positions with the Company held by them respectively, the number of shares of said stock which each will be authorized to purchase as aforesaid, and the price per share to be paid by them, respectively, *302 to the Company are as follows: Name
Position
No. of Shares
Aggregate Price
R. R. Mac Murphey
Vice-President
1100
$1925.
A. K. Shields
Secretary
1000
1750.
B. L. Stratton
Assistant Secretary
600
1050.
N. R. Feasley
Branch Manager
650
1137.50
H. K. Taylor
Advertising Manager
1150
2012.50
J. C. Hazelton
Assistant Branch Manager
1000
1750.
Pursuant to the authority granted by the Board, the president of the Company, Herbert Bristol (now deceased), personally drafted a letter to each of the employees concerned, including the petitioner, advising them of their right to purchase, and requesting that they indicate their acceptance by signing and returning the letter. The petitioner accepted the offer of the Company on August 7, 1944. The pertinent part of the letter reads as follows: "Since July 11, 1944, I, on behalf of the Company, have offered to sell to you all or any part of 1,000 shares of the Common Stock of the Company, out of the 16,000 shares of Common Stock reserved for sale to officers and employees of the Company pursuant to its Plan of Recapitalization approved February 25, 1944, at a price of $1.75 per share. You have *303 advised me that you wish to accept that offer to the extent of 1,000 shares of Common Stock. "This letter will confirm the agreement of the Company to sell to you from time to time during the three-year period ended June 30, 1947, 1,000 shares of Common Stock in the aggregate, at a price of $1.75 per share, payable in cash in each instance upon receipt by the Company of written notification from you of the number of such shares which you wish to purchase at the date of such notification. "Your right to purchase all or any shares of Common Stock pursuant to the above mentioned agreement, is not assignable by you." There was an oral understanding between each employee concerned and the Company that none of the shares to be purchased would be sold as long as the employee remained with the Company, but there was no requirement that an employee remain with the Company in order to be entitled to delivery of the shares. The petitioner did not consider either his right to purchase the Company's common stock, or the purchase, as additional compensation for his services. The Company has never claimed, or received the benefit of, any deduction for, or on account of, the difference between *304 the fair market value of the common stock sold to the petitioner and the purchase price thereof. Pursuant to I.T. 3795, the Company and the petitioner filed their consent not to treat any part of the value of the stock acquired by the petitioner as additional compensation. In fixing compensation of employees, the stock purchase contract was never considered or taken into account. Employees who were offered the stock understood that the contract was a binding obligation on their part to purchase, and that if they desired to progress with the Company, it was "absolutely essential" that they purchase the stock. It was the intent of the Company, in selling shares of its common stock, to make its young executives feel that they "were a part of the Company". Pursuant to the agreement of August 7, 1944, the petitioner tendered payment and took delivery of the common shares of the Company, as follows: August 22, 1944
100 shares
November 15, 1946
400 shares
March 6, 1947
500 shares
On the dates in question, the common stock of the Company was listed on the New York Curb Exchange. During the year 1944, 3,800 shares of common were traded. The fair market value of *305 unencumbered shares of the common stock of the Company on August 7, 1944, and on August 22, 1944, was $3.50 per share. On November 15, 1946, there were no sales. The closing quotations were 9 bid, 10 asked. During the week ended Saturday, November 16, 1946, 400 shares were traded at prices ranging from 9 5/8 to 10, but these sales were effected prior to November 15, 1946. The first sale made after November 15, 1946, occurred on Wednesday, November 20, 1946, at 9 1/4. On March 6, 1947, 400 shares were sold at prices ranging from 12 to 12 1/2. The closing bid and asked quotations on that date were 11 1/4 bid, 12 1/8 asked. During the week ended March 7, 1947, 700 shares were traded at prices ranging from 12 3/4 high to 12 1/8 low. The first sale after March 6, 1947, occurred on March 9, 1947, when 100 shares were traded at 11. Under date of November 2, 1944, the Company submitted, over its president's signature, on Form SSU-1, an application to the Salary Stabilization Unit for approval of the employee stock purchase plan involving the sale of stock to the petitioner and others. Under date of November 3, 1944, each employee, in response to a request from the Company, signed a *306 letter addressed to the Company in which it was stated: "Any shares * * * acquired by me pursuant to my agreement with the Company dated August 4, 1944, have not been and will not be so acquired by me with a view to sale or other distribution * * *." The Company then forwarded a copy of this letter to the Salary Stabilization Unit. Under date of November 17, 1944, the Company stated in a letter to the Salary Stabilization Unit that the sole purpose of the sale was to provide an opportunity, as an incentive, to employees to become part woners. On December 19, 1944, the Salary Stabilization Unit denied the application of the Company for authority to issue stock pursuant to the agreement of August 7, 1944. On December 29, 1944, the Company filed a protest with respect to the denial of its application. On January 11, 1946, the Salary Stabilization Unit advised the Company that no approval was required for the issuance of the stock pursuant to the agreement of August 7, 1944. The petitioner did not consider either his right to purchase stock of the Company or the purchase of the stock, as compensation for his services, and did not include in gross income any amount on account *307 of the execution of the contract or the purchase of the stock. The acquisition of stock by the petitioner did not result in additional compensation to him. Opinion By amended answer the respondent raised a contention that the petitioner should be taxed in 1944 on the difference between the "option price and fair market value" of the stock at the date the "option" was given. This contention has been abandoned and the issue is narrowed to whether or not the petitioner realized taxable income through his purchase of Company stock pursuant to the arrangement which he had with the Company in the taxable years. The respondent maintains that our decision in this case should be governed by Regulations 111, section 29.22 (a)-1 as amended after the decision of the Supreme Court in Commissioner v. Smith, 324 U.S. 177, by T.D. 5507, dated April 12, 1946, 1946-1 C.B. 18, and elaborated in I.T. 3795, 1946-1 C.B. 15. By its terms, however, the amended Regulations were not to apply to options granted prior to February 26, 1945, (the date of the decision in the Smith case) and, as in Abraham Rosenberg, 20 T.C. 5, we rather look *308 for our answer in the opinions of the courts in which the question was dealt with under the old Regulations. The initial inquiry in cases of this kind is essentially factual and is concerned with ascertaining whether or not the stock purchase arrangement between the petitioner and his employer Company was in the nature of compensation for services rendered or to be rendered. If it was, we then reach the collateral questions of when the compensation was received and the amount thereof. If it was not, those questions need not be decided. We have given careful attention to all of the evidence, particularly the corporate actions taken, the expressed understanding of the petitioner and other employees interested in the purchase of stock in the Company, and other factors, and after having done so, conclude that the arrangement was not intended to afford compensation to the petitioner. In reaching this conclusion we are not unmindful that the petitioner was given the opportunity to purchase the stock because he was in fact an employee of the Company and that the very existence of this relationship makes it the more difficult for us to reach the result we have. Cf. Delbert B. Geesman, 38 B.T.A. 258. *309 More specifically, and without undue elaboration, the factors which influence our decision are as follows. The setting aside of the 16,000 shares for future sale to key employees was part of a plan of recapitalization and had nothing to do with the salary arrangement under which the petitioner was employed. Neither the petitioner nor the Company considered or treated the stock purchase plan as constituting compensation. The avowed purpose of the plan was to provide an opportunity and an incentive for specified employees to become part owners of the business. The right to purchase stock was not assignable by the petitioner. The petitioner's cash salary was increased after he agreed to purchase the shares allotted to him, but the increase was not dependent on the purchase. The Company never took any deduction on its tax returns based on the stock purchase plan. We think these factors outweigh others from which a contrary inference might be drawn, such as the spread between the purchase price of $1.75 and the market price of $3.50 existing when the purchase rights were given; the comparatively modest salary of the petitioner, and the fact that the plan was presented to the Salary Stabilization *310 Unit for approval. Taking the record as a whole we conclude that there was no compensatory intent involved in making the stock available for purchase by the employees. Neither Connolly's Estate v. Commissioner, 135 Fed. (2d) 64, nor Commissioner v. Smith, supra, would seem to militate against the result reached here. In Connolly's Estate the Court of Appeals for the Sixth Circuit said: "it is clear that the opportunity of the bargain purchase of shares * * * afforded * * * to * * * Connolly * * * was intended as additional compensation". And in the Smith case the Supreme Court accepted a finding by this Court from the option itself, the resolution of the board of directors, and the petitioner's own testimony that "Western gave the option to petitioner * * * as compensation for services". Cf. Harley V. McNamara, 19 T.C. 1001. We make no such findings here. Decision will be entered for the petitioner.