Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*

HARLEY V. McNAMARA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29846.   Promulgated March 5, 1953.

Herman A. Fischer, Esq., for the petitioner.
David F. Long, Esq., for the respondent.

1006

OPINION.

RAUM, *Judge:* Petitioner became executive vice president and general manager of National Tea Company on March 21, 1945. Although he had an understanding at that time as to his compensation, no contract of employment was then entered into, presumably on account of the salary stabilization regulations, and he was merely given a "drawing account." Pursuant to an executive order of the President of the United States issued on August 18, 1945, the Bureau of Internal Revenue on August 22, 1945, announced a relaxation of its salary stabilization rules. On the very next day the executive committee of National authorized its treasurer to seek approval from the Salary Stabilization Unit of petitioner's salary from the date of his employment on the same basis as his drawing account, and recommended that the board of directors approve the granting of an option to petitioner to purchase 12,500 shares of National's common stock at $16 per share. The board of directors met on the following day, fixed petitioner's salary, and in the same resolution provided for petitioner's option. On that day, August 24, 1945, petitioner entered into a 2-year employment contract with National, dated March 21, 1945, and also was granted the option which is the subject of this controversy.

Under the terms of the option petitioner was not permitted to acquire the 12,500 shares at once. The option period was divided

into 4 parts of 6 months each, corresponding roughly to petitioner's 2-year contract of employment.[1] In substance petitioner was permitted to exercise the option only to the extent of 3,125 shares during the first 6 months, with an increase of 3,125 additional shares for each 6-month period thereafter. On the date the option was granted, August 24, 1945, the stock sold on the New York Stock Exchange at from $18.50 a share to $19.50 a share, and we have found that its fair market value at that time was $19 a share.

Petitioner exercised his option on two separate occasions, the first time on March 12, 1946, when he obtained 6,250 shares, and on March 6, 1947, when he obtained the remaining 6,250 shares. He paid the option price of $16 a share; on March 12, 1946, the stock was selling on the New York Stock Exchange at $28.50 a share, and on March 6, 1947, at a range of from $28.25 to $28.50 a share. The Commissioner contends that petitioner realized taxable income on each of these two days, in 1946 and 1947, measured by the difference between the fair market value of the stock acquired and the option price. Petitioner, on the other hand, contends that whatever income he received by reason of the option was realized only in 1945, when the option was granted to him and consisted merely of the fair market value of the option, which he has undertaken to establish by expert testimony. In the alternative, he contends that he realized no income whatever by reason of the option or its exercise. We shall consider this latter contention first.

1. The starting point for a consideration of this question is the decision of the Supreme Court in *Commissioner* v. *Smith*, 324 U. S. 177, rehearing denied, 324 U. S. 695, 889. In that case the taxpayer was an employee of Western, a corporation which took over the management and rehabilitation of another corporation, Hawley, pursuant to a plan of reorganization. The taxpayer was active in the reorganization, and Western gave him an option to purchase a part of the Hawley stock which Western would acquire. The market price of the stock did not exceed the option price on the date of the option, but when the taxpayer exercised the option in 1938 and 1939, the market price had advanced considerably. The Supreme Court approved a determination that the option was given as compensation for the taxpayer's services and that such compensation was "to be derived from the exercise of the option after the anticipated advance in market price of the stock." 324 U. S. at 180. The Court referred to section 22 (a) of the statute and to Regulations 101, art. 22 (a)–1 and Regulations 103, art. 19.22 (a)–1, and stated (p. 181):

Section 22 (a) of the Revenue Act is broad enough to include in taxable income any economic or financial benefit conferred on the employee as compen-

---

[1] There was in fact a discrepancy because the employment contract was back-dated to March 21, 1945, whereas the option period began on August 24, 1945, the date that the option was granted and the employment contract actually executed.

sation, whatever the form or mode by which it is effected. See *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, 729. The regulation specifically includes in income, property "transferred . . . by an employer to an employee, for an amount substantially less than its fair market value," even though the transfer takes the form of a sale or exchange, to the extent that the employee receives compensation.

We have no doubt that the option and the contemplated benefits to petitioner herein were intended as compensation to petitioner. We cannot agree that the option was awarded to him merely to give him a proprietary stake in the enterprise.

When petitioner first discussed with Cuneo his employment as general manager of National, he stated that he would want a fixed salary, a percentage of profits, and the opportunity to acquire stock. The proposed contract which Cuneo submitted to him in February 1945 provided for a fixed salary of $27,500 per year, 2 per cent of the net profits in excess of $300,000, and an option to purchase 12,500 shares of National's stock at $12 per share during the 1-year term of that contract. The stock was then selling at $15.25 per share. Although this proposed contract was discussed at the directors' meeting of March 21, 1945, it was not executed undoubtedly because of salary stabilization difficulties. If the option was not intended to compensate petitioner for services rendered or to be rendered, no question of salary stabilization would have been involved and it could have been executed when petitioner was employed on March 21, 1945. When the directors met on August 24, 1945, shortly after the salary stabilization rules had been relaxed, the executive committee recommended to them not only the cash compensation for petitioner but also the option, and a resolution providing simultaneously for the cash salary and option was adopted at that meeting. In petitioner's return for 1945, he reported the receipt of the option as compensation for services in the amount of $16,375. National in its 1945 return claimed a deduction for compensation to officers which included $16,375 in respect to the option granted to petitioner. In its annual report filed with the Securities and Exchange Commission for the year 1945, National stated that the consideration for the granting of the option to petitioner was "Services rendered and to be rendered."

The option gave petitioner the opportunity to purchase stock during the period of his employment at less than its market price when issued. It was consistently referred to and treated by both National and petitioner as compensation. It was intended to confer an economic and financial benefit upon him as compensation by enabling him to make a bargain purchase. While it was in the interest of National to grant this benefit, that did not detract from its compensatory nature. Neither did the fact that one of the motives in granting it was "to encourage his interested and enthusiastic efforts," for that is frequently one of the objectives of giving employees additional compensation

in the form of bonuses and stock options. We are fully satisfied on the record before us that the gain to be derived from the option was intended as compensation to petitioner, and that the option was not awarded to him merely to give him a proprietary interest in the corporation.

2. We are also convinced that the intended compensation was not the "value" of the option but was the difference between the fair market value of the stock on the date of exercise and the option price. To be sure, the opinion in the *Smith* case notes that the option there involved was not found to have any market value when given, and it makes plain that (324 U. S. at 182) : "It of course does not follow that in other circumstances not here present the option itself, rather than the proceeds of its exercise, could not be found to be the only intended compensation." Petitioner herein relies upon that language.

The difficulty with petitioner's position is that, as we view the facts in this record, the option itself was not "the only intended compensation." This is not a case of the distribution of a stock option or warrant, which has a clearly ascertainable market value or which the employee could readily sell. Although there was no provision in the option forbidding assignment, it is nevertheless plain that no assignment or sale was ever contemplated by either party.

The option was of a restrictive type, the number of shares obtainable thereunder depending upon in which of the four half-yearly periods it would be exercised. In this respect, the present case is comparable to *Wanda V. Van Dusen*, 8 T. C. 388,[2] affirmed, 166 F. 2d 647 (C. A. 9), where, as here the employee could have exercised the option at once only as to the block of stock available during the first of a series of periods.

We are fully aware that petitioner's expert witness undertook to place a fair market value upon the option as a whole as of the date it was received by petitioner. However, the witness did not display any particular knowledge of options of this type, nor are we satisfied that he had any experience in the sale or purchase of such options. The option as a whole was highly speculative and depended upon market values ranging over a long period of time. We are not satisfied either that the witness' arithmetic calculations reflect the true value of the option or that the option represented a property interest that could readily be disposed of without a sacrifice. The latter consideration, while perhaps not crucial, is nevertheless relevant in determining whether the option itself may be regarded as "the only intended compensation."

We think that the facts as a whole in this record point to the conclusion that the "intended compensation" in this case was not the

---

[2] The opinion in the *Van Dusen* case referred to certain cases which had been decided prior to the *Smith* case as having become "obsolete." 8 T. C. at 393.

option itself, but rather the profit to be derived upon the exercise of the option. This conclusion is confirmed by the fact that, although the option was not explicitly tied to petitioner's 2-year contract of employment, such continued employment was nevertheless plainly contemplated. Petitioner himself had told Cuneo that National's lack of success was due to "management," and it seems clear that a change in management with petitioner as general manager, was expected to bring improvement. Such improvement would be reflected in a higher market price for National's stock, and thus, to the extent that petitioner's efforts as general manager would be successful, he would be rewarded in part the rise in value of the stock obtainable under the option. Taking all the facts and circumstances into account, we conclude and find that the option arrangement was intended to represent compensation to petitioner at the time of exercise, in an amount equal to the spread between market value and the option price. This conclusion makes it unnecessary to consider whether T. D. 5507, 1946–1 C. B. 18 and I. T. 3795, 1946–1 C. B. 15, are justified by the decision in the *Smith* case or are otherwise authorized by statute. See S. Rept. No. 2375, 81st Cong., 2d Sess., p. 59.[3]

That the holding in the *Smith* case is not limited to cases where there was no spread between market price and the option price at the date of issuance of the option is made clear by *Connolly's Estate* v. *Commissioner*, 135 F. 2d 64 (C. A. 6), affirming 45 B. T. A. 374. The *Connolly's Estate* case is particularly significant, because the *Smith* case had been decided differently by the Court of Appeals for the Ninth Circuit (142 F. 2d 818), and certiorari was granted in the *Smith* case for the purpose of resolving the asserted conflict between the two cases. 324 U. S. at 178. In the *Connolly's Estate* case each of the taxpayers had been given an option, dated March 1, 1935, to purchase 6,000 shares of his employer's stock, 2,000 of which could be purchased at 50 cents a share within 1 year, 2,000 shares at a dollar a share within 2 years, and 2,000 shares at $1.50 a share within 3 years. At the time the options were granted, the market value of the stock was $2⅜ per share, nearly two and a half times the average option price. Nevertheless, in the circumstances of that case, it was held that the subsequent exercise of the options in 1936 when the market value of the stock was $5 a share resulted in the realization of taxable income in 1936 measured by the spread between the then market value of the stock and the option price. Surely the decision of the Supreme Court in the *Smith* case, that was intended to resolve a conflict with the decision in the *Connolly's Estate* case, cannot be read as disapproving

[3] Nor is there any occasion to consider the amendment which was made to the Internal Revenue Code through the addition of section 130A by section 218 of the Revenue Act of 1950, c. 994, 64 Stat. 906, 942. Not only is it questionable whether the option herein is of the type that would be governed by section 130A, but the transactions here involved all occurred prior to 1950. See S. Rept. No. 2375, *supra*, at p. 60.

the latter. We understand the holding in the *Smith* case to apply to situations of this kind, unless it is shown that the option itself was "the only intended compensation"; and the fact that there may or may not be a spread between the option price and market price on the date of the issuance of the option is merely a factor to be taken into account. The *Connolly's Estate* case certainly demonstrates that existence of such a spread is not fatal to the result reached in the *Smith* case itself, and we think that the *Connolly's Estate* case furnishes support for our conclusion here.[4]   Cf. *John C. Wahl*, 19 T. C. 651.

3. Finally, we reach the question as to the fair market value of the stock when it was acquired by petitioner on March 12, 1946, and March 6, 1947, in blocks of 6,250 shares each. On March 12, 1946, two hundred shares were sold on the New York Stock Exchange, at $28.50 a share; and on March 6, 1947, a total of 200 shares was similarly sold, at prices ranging from $28.25 to $28.50 a share. The Commissioner determined fair market value to be $28.50 a share on March 12, 1946, and $28.375 on March 6, 1947. The petitioner challenges these determinations, contending that a block of 6,250 shares could not have been sold at those times at such prices. Petitioner invokes the familiar "blockage" principle.

As to the determination of fair market value of $28.50 a share for March 12, 1946, we are satisfied, on the facts before us, that the blockage principle has no application. We have in the record the number of shares sold during each trading day between February 1 and April 30, 1946, together with the open, high, low, close, bid, and asked quotation for each such day, and we think that 6,250 shares could have been sold within a reasonable period at about March 12, 1946, at $28.50 a share. Indeed, when, on April 2 and April 3, 5,800 and 5,500 shares, respectively, were sold, the market rose to over $30 a share, and continued to rise throughout the remainder of the month. We approve the determination of the Commissioner as to value on March 12, 1946.

The situation as of March 6, 1947, however, is different. The record similarly contains the daily quotations and number of shares sold during the comparable 3-month period in 1947, and it seems clear that the market was considerably weaker than during the corresponding period in the previous year. We are satisfied that 6,250 shares could not have been sold at about March 12, 1947, at $28.375 a share, as determined by the Commissioner; it is our best judgment that the 6,250 shares of stock had a fair market value of $27.50 a share on that date, and we have so found as a fact.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[4] To be sharply distinguished upon its facts is the recent decision in *Estate of Lawson Stone,* 19 T. C. 872, 877, where it was stated that "the reasonable inference to be drawn from the facts presented is that the parties were dealing in stock warrants and not the shares of stock that could be acquired thereunder."