DEAN BABBITT AND ESTELLE BABBITT, PETITIONERS,[1] v. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 41947, 51515–51518.    Filed February 14, 1955.

*J. Henry Landman, Esq.*, for the petitioners.
*James J. Quinn, Esq.*, for the respondent.

---

[1] Following proceedings are consolidated herewith: Dean Babbitt, Docket No. 51515; Dean Babbitt and Estelle Babbitt (husband and wife), Docket Nos. 51516, 51517, and 51518.

854

OPINION.

FISHER, *Judge:*

*The Stock Option Issue.*

The first issue involved in the instant case is whether or not petitioner realized additional income in 1947 upon his exercise of an op-

tion previously granted to him by his employer to purchase its common stock. In 1936, the Sonotone Corporation as part of an employment contract between the company and petitioner granted him an option to purchase 30,000 shares of its common stock at $2 per share, the then listed price of the stock on the New York Curb Exchange. The contract, which was for a period of 3 years subject to termination by either party upon 3 months' notice, provided that petitioner was to be the chief executive officer of the company and was to receive a salary of $30,000 per year plus 5 per cent of the certified annual net earnings of the company. The contract also provided that the stock option was good until the close of business on January 31, 1939, the expiration date of the contract, and that, in case of termination of the contract, petitioner's rights to any unexercised portion of the stock option would terminate as of the effective date of the termination notice. The contract was "personal and non-assignable" so far as petitioner was concerned.

Petitioner did not exercise any part of the stock option during the term of the 1936 contract. In 1939, however, the parties entered into another agreement which extended and renewed the 1936 contract for 5 years until January 31, 1944, upon the same terms and conditions except that the option price was reduced to $1.50 per share which was the price listed on the Curb on the date the 1939 agreement was executed. Petitioner exercised only a portion of the option during the term of the 1939 contract.

On January 19, 1944, the parties entered into another 5-year contract to extend and renew the 1936 agreement as modified by that of 1939, subject to certain other modifications. One of the modifications provided that the unexercised portion of the stock option should continue until January 31, 1949, even in the event of the sooner termination of the contract by either party, and that the option might be exercised by petitioner's personal representatives in the event of his death or incompetency prior to that date. Thereafter, petitioner exercised portions of the option by purchasing at a price of $1.50 per share 10,000 shares on February 28, 1944, when the price on the Curb was 2⅜, and 10,000 shares on November 3, 1947, when the price on the Curb was 4¼. We are concerned in the instant case with the latter purchase which respondent has determined resulted in petitioner's realization of "taxable income by way of compensation for services in the amount of $27,500." Petitioner, on the other hand, contends that the option was not granted as compensation for services and that therefore no taxable income was realized by petitioner upon the exercise of a portion thereof in 1947.

It should be noted at the outset that the option in the instant case was granted to petitioner prior to February 26, 1945, the effective date of

the amendments made to Regulations 111, section 29.22 (a)–1, by T. D. 5507, 1946–1 C. B. 18. T. D. 5507 expressly provides that in the case of property transferred by an employer to an employee pursuant to the exercise of an option *granted* before February 26, 1945, the regulations prior to such Treasury Decision shall apply. Accordingly, we are not concerned with the applicability of T. D. 5507 to the facts at hand. Cf. *Philip J. LoBue*, 22 T. C. 440. Nor are the provisions of section 130A of the 1939 Code, effective for taxable years beginning after 1949, applicable to the instant case.

Regulations 111, section 29.22 (a)–1, *prior* to T. D. 5507 provided in part as follows:

If property is transferred * * * by an employer to an employee, for an amount substantially less than its fair market value, regardless of whether the transfer is in the guise of a sale or exchange, such * * * employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of (1) compensation for services rendered or to be rendered * * *

These provisions were quoted with approval by the Supreme Court in *Commissioner* v. *Smith*, 324 U. S. 177 (1945).

In the instant case, the option price paid by petitioner for the stock in 1947 was substantially less than its then fair market value (discussed *infra*). The problem presents an issue of fact as to whether or not the option was granted to petitioner as additional compensation for his services rendered or to be rendered to the Sonotone Corporation. *Harold E. MacDonald*, 23 T. C. 227; *Charles E. Sorensen*, 22 T. C. 321; *Abraham Rosenberg*, 20 T. C. 5. Upon consideration of all the facts in the instant case, we find that the excess of the fair market value in 1947 over the option price of the shares acquired in that year by the exercise of the option was compensatory for the reasons set forth below.

The company first granted petitioner a stock option in the 1936 employment contract, and unused portions of the option were carried over with certain modifications into the succeeding contracts of 1939 and 1944. Prior to its execution of the 1944 agreement, the company was not under any legal obligation to renew or extend the option beyond the expiration date of the 1939 contract. It agreed, however, as part of the bargain by which petitioner's services were retained for an additional term, to grant him the right to exercise the then unexercised portion of the original 30,000 share option at any time during the succeeding 5-year period. Under such circumstances, we believe that the terms of the 1944 contract grant an option which is legally separate and distinct from the prior options. In practical effect, however, the 1944 option is a continuation of the one which was granted in 1936. Accordingly, in our consideration of the nature of the 1944 option, we look first to its origin in 1936.

It is apparent from the record that the original option, contained in the 1936 contract, was granted at petitioner's insistence. At the time of such insistence, he was in a strong bargaining position. His prior services had been productive; he had offers from other companies; and the then president of the company was so ill that it was evident that it would be necessary for the company to elect a new president who would be its chief executive officer.

It is clear that petitioner bargained for the option as an integral part of his requirements as a basis for accepting the terms of employment. When, during the negotiations for the 1936 contract, he was offered a 5,000-share option, he termed the offer "absolutely ridiculous." He testified further that "I was the one—it wasn't offered to me—I was the one that insisted on the 30,000 shares." When asked "Would you have accepted the employment if you didn't get a stock option?", he answered, "I don't think I would have."

In essence, not only the 1936 contract but also the 1939 and 1944 contracts covered only the terms of employment. The references therein to the option were not couched in terms which were calculated to classify it in any different category. Neither the contracts nor the authorizing minutes of the board of directors characterized the option in any manner indicating that it was intended to be proprietary, rather than compensatory. The record contains no contemporaneous written statement on the part of the company that it desired or intended that the option be granted to permit petitioner to acquire a proprietary interest. While there is no legal requirement that such a contemporaneous record be made, in dealing with an issue of fact we think it appropriate to note the absence of any such record. This is in contrast with the facts in *Philip J. LoBue*, *supra*, where, in notifying petitioner and other key employees of the action by the stockholders and directors granting them stock options, the executive vice president wrote in part as follows:

The purpose of this is to provide an incentive to key employees and especially to permit such men to participate in the success of the company. This is a method or plan which has been followed by many of the leading American corporations.

We may add that there is no evidence in the record that any policy of granting the key men the opportunity to acquire proprietary (incentive) interests in the company was adopted, or that anyone except petitioner was granted such an option.

Petitioner contends that the reason for the granting of the option in the 1936 contract was to give him the opportunity to acquire a proprietary interest in the company to protect him from the efforts of one of the directors to place a relative in the position of president. This may well have represented one factor in petitioner's desire to obtain the option. Nevertheless, we do not attach primary significance to this factor.

The number of option shares initially suggested to petitioner was 5,000 and the number was increased to 30,000 as a result of bargaining in relation to the terms of employment. The record is bare of any factual background indicating that either 5,000 or 30,000 shares would have been a material factor in the control of the corporation. It is quite apparent that petitioner's acquisition of 30,000 shares out of a total of over 800,000 shares outstanding would not, of itself, have accomplished the objective which petitioner asserts was his purpose in acquiring the shares. There is no evidence in the record that others owning sufficient stock, which when added to the 30,000 shares subject to the option would have resulted in practical control of the company, had agreed to act in concert with him. Moreover, as above indicated, there is no support for any suggestion that the company itself desired petitioner to have 30,000 shares as an incentive from the perspective of proprietorship. Nevertheless, the contention of petitioner centers around the element of control, with respect to which, as already indicated, essential information is lacking.

We add that in carefully following the testimony of petitioner, we noted the repeated use by him of words in the nature of conclusions having a specialized tax significance. This, together with the absence of affirmative facts furnishing sound reasons for his conclusions, left us with the impression that the emphasis placed by him on the factor of combating the efforts of the antagonistic director was to some extent a reconstructed emphasis which had developed in petitioner's mind in the atmosphere of his obvious understanding of its importance from a tax standpoint.

We are convinced, for the foregoing reasons, that the original option grant was primarily intended to be compensatory, and as such was a material part of the consideration upon which petitioner insisted as a part of his employment contract. Conceding that the acquisition of the option to purchase 30,000 shares might have strengthened petitioner's position in the company in some measure, it is our view that this was an intangible factor of secondary significance which can neither be isolated nor evaluated from the record. As we said in *Harold E. MacDonald, supra* (citing *Delbert B. Geeseman*, 38 B.T.A. 258), "In the instant case, as in so many cases of this nature, 'both elements are present and decision is impossible if the absence of one or the other is essential thereto.'"

The option was renewed in the 1939 employment agreement, but the option price was reduced to the then market price of $1.50 at petitioner's request as part of the terms of renewal. This supports the view that the option was compensatory in nature, being granted as part of the consideration to enable the company to further retain petitioner's services. It may be added that there is no evidence that the adverse

efforts of the antagonistic director had continued after the execution of the 1936 contract.

Since we believe that the option was compensatory in nature prior to the execution of the 1944 contract, we next consider the effect of that contract on the nature of the option. The 1944 contract modified the option to give petitioner the right to exercise the then unexercised portion of the 30,000-share option at any time during the succeeding 5 years regardless of whether or not he was employed by the corporation at the time of exercise. It also preserved the option to his personal representatives or committee in favor of his wife or next of kin in the event of his death or judicially declared incompetency within the period provided in the contract. The exercise of the option in 1947, here in issue, occurred after petitioner had resigned as president of the company but while he was serving in an advisory capacity for which he was receiving substantial compensation.

Petitioner (although, of course, arguing that the option was proprietary) has vigorously maintained that the changes made with respect to the option in the 1944 contract did not in any way alter its nature. As already indicated, it is our view that the option was compensatory, but we agree that the 1944 contract did not change its nature.

It should be noted that the option was renewed in 1944 as part of the contract by which petitioner's services were retained for an additional term, and that the option price of $1.50 per share contained in the preceding contract was continued. In the light of the background of the previous contracts, and in the absence of any indication to the contrary, we think that the inference is again clear that the renewed option, including the terms expanded for petitioner's benefit, was granted in order to enable the company to retain for the future services which had proved valuable in the past.

We are thus convinced upon consideration of all of the facts in the record that the option was granted to petitioner in 1944 as compensation, in addition to the salary and percentage of net earnings provided for in the contract of employment.

We add that we attach no significance to the treatment by the corporation of petitioner's exercise of the option in 1944 and 1947 in its original returns for those years or its later reversal of that position in its amended returns. *Harold E. MacDonald, supra; Philip J. LoBue, supra.*

Petitioner contends, however, that respondent is now estopped from asserting that the option is compensatory. He argues that respondent "acquiesced" in treating the option as proprietary in nature with respect to the exercises of portions of the option on August 9, 1940, and January 28, 1944. Although it appears from statements by petitioner's counsel that respondent did not challenge petitioner's failure to report income from those two exercises made during the

term of the 1939 contract, there is no evidence of this, or any other form of acquiescence, in the record. Accordingly, the issue raised by petitioner's contention is not actually before us. Assuming, however, that respondent did fail to challenge petitioner's omission of such gain in his 1940 and 1944 returns, we think it is clear his failure to take affirmative action does not give rise to an estoppel situation analogous to that present in either *Stockstrom* v. *Commissioner* (C. A., D. C. Cir., 1951) 190 F. 2d 283, or *Vestal* v. *Commissioner*, (C. A., D. C. Cir., 1945) 152 F. 2d 132, relied on by petitioner, and therefore we are not called upon to determine whether these two cases will be followed by us. For completeness, we mention that the assertion made on petitioner's behalf that respondent had "conceded" that the option was proprietary under the 1936 and 1939 contracts is not supported by anything in the record, and is denied by respondent.

As an alternative contention, petitioner argues that, if the 1944 option is compensatory in nature, it constituted additional compensation to petitioner on January 19, 1944, when it was granted to him, and not in 1947 when it was partly exercised. He advances the proposition that the additional compensation realized by him in 1944 was the option-day spread, that is, the difference between the option price and the fair market value of the number of shares of stock subject to the option on the day the option was granted.

It is our view that, upon the record, the option itself had no fair market value at the time of the execution of the 1936 and 1939 contracts or on January 19 and February 1, 1944, being respectively the date of execution and the effective date of the 1944 contract. We think this is apparent upon the record without discussion insofar as the 1936 and 1939 contracts are concerned, since the market price and option price were the same when the respective agreements were made. Our view is less apparent as to 1944, and requires an analysis of the relevant facts.

In determining the value, if any, of the option as of January 19 and February 1, 1944, we must recognize the fact that the option was exercisable but not then transferable. Petitioner received the option itself, not the stock which he might then have acquired by its exercise. While there is some confusion in the record as to the number of shares then subject to the option, it is clear that the number was not less than 20,000. Petitioner's expert witness testified that while the list price of the stock was 25⅝, the number of shares subject to the option was so substantial, and the trading so light, that, applying the blockage principle, so large a number of shares would have brought $2 per share or possibly less. It should be noted, however, that all of his views were expressed in answer to questions assuming that only 10,000 shares were under consideration. In fact, the option then applied to not less

than 20,000 shares, and there can be no doubt from the supporting reasons offered by the witness that if he had had 20,000 shares in mind, he would have determined the value to be materially less. Remembering that petitioner could not assign the option itself, and that if he desired to realize upon it, he would have been required first to invest not less than $30,000 in exercising the option, and then sell under conditions in which the application of blockage principles rendered the yield conjectural at best, we must hold that there is no basis in the record for assigning a fair market value to the option itself, or, for that matter, for assigning a fair market value in excess of the option price to the 20,000 shares then covered by it, as of either January 19 or February 1, 1944. See *John C. Wahl*, 19 T. C. 651, 658; *Harold H. Kuchman*, 18 T. C. 154, 163.

It is our view, upon analyzing the circumstances surrounding the granting or extension of the option in January 1944 and the exercise of the option, that it was intended that petitioner should receive compensation, and that he did receive compensation, at the time of the exercise of the option rather than at the time it was granted. With respect to the issue before us, therefore, compensation was received upon the exercise of the option in 1947 as to the 10,000 shares then remaining subject to the option.

In *Commissioner* v. *Smith, supra*, the Supreme Court said, in part (324 U. S. at p. 179):

Since the Tax Court found that the market price of the stock on the date of the option did not exceed the option price, it is evident that its finding that the option was given as compensation for respondent's services, had reference to the compensation to be derived from exercise of the option after the anticipated advance in market price of the stock.

Later (p. 181), the Court added the following:

In certain aspects an option may be spoken of as "property" in the hands of the option holder. Cf. Helvering v. San Joaquin Fruit & Investment Co., 297 U. S. 496, 498, 56 S. Ct. 569, 570, 80 L. Ed. 824; Shuster v. Helvering, 2 Cir., 121 F. 2d 643, 645. When the option price is less than the market price of the property for the purchase of which the option is given, it may have present value and may be found to be itself compensation for services rendered. But it is plain that in the circumstances of the present case, the option when given did not operate to transfer any of the shares of stock from the employer to the employee within the meaning of § 22 (a) and Art. 22 (a)–1. Cf. Palmer v. Commissioner, 302 U. S. 63, 71, 58 S. Ct. 67, 70, 82 L. Ed. 50. *And as the option was not found to have any market value when given, it could not itself operate to compensate respondent.* [Emphasis supplied.]

We think that the principles so announced by the Supreme Court in analyzing the issues in *Commissioner* v. *Smith, supra*, support the inferences which we have drawn from the circumstances surrounding the granting or extension of the option in the instant case under all three contracts, together with the circumstances of the final exercise

of the option in 1947. See *John C. Wahl, supra,* 19 T. C. at pp. 657, 658. In the resolution of the problem presented by this case we are not called upon to consider whether the reversal of *Harley V. McNamara,* 19 T. C. 1001, by the Court of Appeals for the Seventh Circuit, 210 F. 2d 505, will be followed by this Court, since the facts taken by the Court of Appeals in that case to be controlling and assumed by that court to have been established by the record differ materially from the facts in the instant proceeding. In that case the Court of Appeals took the facts to be that the option was "an assignable right to buy the stock at a bargain price," which could have been "promptly sold for a substantial profit," that the value of the option at the time it was granted was substantial and ascertainable, and that the value of the option when granted was intended by the parties to be compensation at that time. Here the option was specifically non-assignable, its value at the time when it was granted was unsubstantial and not readily ascertainable, and we have concluded on the entire record here presented that the parties did not intend that the option when granted was to be compensation at that time.

Respondent determined that petitioner realized compensation upon his exercise of the option in 1947 in the amount of $27,500. This figure is equal to the difference on 10,000 shares between the option price of $1.50 per share and $4.25 per share, the price on the New York Curb Exchange on the date of exercise. Petitioner, on the other hand, contends that blockage principles must be applied in determining the fair market value of the stock on the date of exercise, and that the fair market value of 10,000 shares of the Sonotone Corporation common stock on November 3, 1947, was only 2⅞. Petitioner introduced expert testimony to the effect that if 10,000 shares of this stock were offered for sale "at the market" on that day they would have been sold at an average price of 2⅞. We find ourselves unable to accept this testimony as conclusive.

The market situation as to Sonotone Corporation common stock was quite different in 1947 than it was in 1944. The stock was in greater demand, trading in it was more active, and daily sales in excess of 2,000 shares were absorbed on two occasions without any drastic adverse effect. During the period from October 24, 1947, through November 13, 1947, 11,300 shares of Sonotone Corporation common stock were traded on the New York Curb Exchange. The last sale price on both the opening and closing days of that period was 4¼. The high sale price during that period was 4⅜ on October 27, 1947, when 2,100 shares were traded. The low sale price during that period was 4 on October 29, 1947, when 2,500 shares were traded.

We agree with the expert witness that an offering of 10,000 shares of the stock within a limited period would have had an adverse effect

on the price, but the actual performance of the stock convinces us that the witness was too pessimistic. Applying our own judgment to the evidence in the record, we hold that 10,000 shares of Sonotone Corporation common stock could have been sold within a reasonable time, at about November 3, 1947, for $3.75 per share. See *Harley V. McNamara, supra,* 19 T. C. at p. 1012, reversed on other grounds 210 F. 2d 505.

Petitioner therefore realized compensation upon his exercise of the option in 1947 in an amount equal to the excess of the fair market value of the stock over the option price, or $22,500. *Commissioner* v. *Smith, supra.*

### The Farm Issue.

Petitioner purchased Beech Hill Farm, at Ashland, New Hampshire, in 1940 for $6,000. The farm consisted of about 235 acres of land and a farmhouse and storeroom which were connected to a barn. In addition, there were a large chicken house and a large shop both of which were located a short distance from the main building. The structures were all in a dilapidated condition at the time of the purchase, and petitioner expended over $35,000 during the following 2 years to reconstruct and remodel them.

Farming operations were conducted on the farm at all times after 1940, and for each taxable year thereafter through 1952, the farm suffered losses. For 1953, however, farming operations resulted in a profit of $357.46. The years involved in the instant case are 1947 through 1951, and respondent has determined that the losses reported for those years are not deductible under the provisions of the Internal Revenue Code. He contends that the farm was acquired as a country place for pleasure and later for petitioner's personal residence. We disagree with respondent's determination, and we have found as a fact that the petitioner's farming operation during the years here involved was a business regularly carried on by him for profit. Upon the facts presented, the losses in question are therefore deductible for income tax purposes. The reasons for our view are set out below.

Petitioner and his family did not reside permanently on the farm until October 15, 1949. Prior thereto, except during two vacations and the summer of 1947 when petitioner lived on the farm, he visited it only on occasional holidays and weekends. At these times, petitioner did not use it for entertainment, recreational purposes, or as a hobby. The few occasions on which he took guests with him to the farm were for his convenience in the discussion of business affairs. He had no facilities for the entertainment of guests, business associates, or customers. Until 1946, petitioner resided on his estate in Rye, New York, which he used for extensive entertainment. After 1946,

until he moved to the farm in 1949, he and his family lived in a large apartment in Hartsdale, New York.

When asked at the hearing of the instant case why he acquired the farm, petitioner testified as follows:

I had the idea that sometime I wanted to retire, and I wanted to build up something in the way of security for the future. And I believed the method to do that was by a farm.

And in 1940 when the war situation was on, it looked to me like that would be an opportune time to acquire a farm and build it up over a period of the years and have it on a profitable basis for the time I wished to retire.

Petitioner subsequently clarified these statements by testifying that he had expected the farm to make a profit from the beginning and that he had expected profits to increase until the time he was ready to retire. He also testified that he believed that a piece of productive farm property would provide him with economic security regardless of future changes in the economic situation. While eventualities demonstrated that he was overoptimistic, we are convinced that petitioner operated the farm with a profit motive. Furthermore, as already indicated, the elements of hobby and recreation were not a part of his objectives.

Petitioner himself had not had any previous farming experience, but after purchasing the farm he sought advice and counsel from neighboring farmers and official agencies. He also subscribed to various farm publications. Since he was completely occupied by his duties in New York with the Sonotone Corporation until the end of 1946 and thereafter until 1949 with the Carry-Cab Corporation, petitioner was unable directly to supervise the farming operations. After buying the farm, however, he hired a farmer, whom he then believed was able and experienced, to live on the farm and operate it. Petitioner supplied the tools, machinery, and equipment for use on the farm. By 1945, petitioner had become dissatisfied with the first farmer and he replaced him with another who he felt was better qualified. In his effort to raise a profitable crop, petitioner shifted emphasis during the years from one to another of various products including pigs, dairy products, apples, and potatoes, although in fact, despite his shifting of objectives, each such venture proved financially unsuccessful until 1953 when the farm produced a net profit for the first time. (During 1952 the second farmer was replaced by a third in whom petitioner evinced great confidence.) It may be added that he at no time indicated that he was attempting, as a hobby, to raise prize cattle or other prize products.

After October 15, 1949, petitioner and his family resided on the farm. He subsequently devoted much of his time to the Belmar Electric Corporation located in nearby Tilton, New Hampshire. Petitioner

is the president of this company which makes incandescent lamp sockets. Although his household was supplied with some of the farm's produce both before and after the family moved there, petitioner charged himself for that produce on the books maintained for the farm.

Upon consideration of all of the facts, we believe that the farm was operated on a commercial basis and not for petitioner's recreation or pleasure or as an outlet of any desire for a hobby. Respondent, however, argues that the long series of losses sustained by petitioner on the farm indicate that he had no actual intention of making a profit. We have held that such circumstances are not controlling "if other evidence shows there is a true intention of eventually making a profit." *Norton L. Smith*, 9 T. C. 1150, 1155 (1947). In the instant case, the evidence before us convinces us that the farm was operated by petitioner during the years here involved as a business regularly carried on by him for profit, although there was no net profit until 1953.

The notices of deficiency issued by respondent in the instant case make the general determination that the farm losses for the years 1947 through 1951 "are not deductible under the provisions of the Internal Revenue Code." There is no determination by respondent that any of the expenses which were factors in computing the farm loss for any of the years in question were not ordinary and necessary in carrying on the farming business. Our examination of the record discloses no basis for disallowing any of the farm expenses deducted by petitioners in the returns as filed.

### Statute of Limitations.

Petitioner contends that this proceeding is barred with respect to the year 1947 by the provisions of section 275 (a) of the 1939 Code because the notice of deficiency dated November 4, 1953, was not sent to him within 3 years after the return for that year was filed. He concedes, however, that his execution on January 27, 1953, of a consent to extend the period of time for assessment to June 30, 1954, removes the bar of the statute if section 275 (c) of the 1939 Code is applicable in the instant case to permit determination of a deficiency within 5 years of the filing of the return. That section is applicable "if the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, * * *."

The record fully substantiates an affirmative finding that taxpayer omitted from his 1947 return gross income in excess of 25 per centum of gross income as reported. Petitioner reported gross income of $16,613.72 for the year in question. Since we have found that petitioner received taxable income in the amount of $22,500 in that year

upon the exercise of his option to purchase 10,000 shares of Sonotone stock at $1.50 per share, and since this income was omitted from and exceeded 25 per centum of his reported gross income, section 275 (c) is applicable to the instant case. Accordingly, we hold that the proceeding is not barred by limitations for the year in question.

Petitioner argues, however, that he did not omit the above amount from his gross income within the meaning of that section because he "had completely disclosed his Sonotone stock option transactions on his tax returns." He cites in this respect *Uptegrove Lumber Co.* v. *Commissioner*, (C. A. 3, 1953) 204 F. 2d 570. In that case, the court held that the phrase "omits from gross income" in section 275 (c) is limited in effect to a failure to include some receipt or accrual in the computation of gross income rather than to an understatement of gross income due, for example, to an overstatement of cost of goods sold. It did not hold, however, that a general disclosure that transactions had occurred was sufficient compliance with the statute where the income or gain from such transactions was not included in gross income. Petitioner's 1947 return does not include in the computation of gross income any part of the taxable income received by petitioner in that year as a result of the exercise of his option. There is no direct mention of the exercise of the option or the purchase of the stock in the 1947 return. While the stock option transactions are factors in returns for later years in which gains arose from subsequent sales of the stock acquired in 1947, there is nowhere any act or disclosure which could be deemed an inclusion in gross income under the rule of the *Uptegrove* case or any other authority which has come to our attention.

While our own construction of section 275 (c) has not, in all respects, been in accord with that set forth in the *Uptegrove* opinion, the area of difference has not been on the issue raised by petitioner in the instant case. We therefore have no occasion here to enter into any discussion of the differing perspectives.

*Decisions will be entered under Rule 50.*