John S. Ellsworth and Eleanor M. Ellsworth v. Commissioner.
Ellsworth v. Commissioner
Docket No. 89892.
United States Tax Court
T.C. Memo 1962-32; 1962 Tax Ct. Memo LEXIS 277; 21 T.C.M. (CCH) 145; T.C.M. (RIA) 62032; February 15, 1962
*277 Petitioner, an experienced breeder of dairy cattle for many years, reentered the occupation in 1948 on his farm known as "Folly Farm." About 10 to 15 years are required to develop a breeding herd with a superior strain and of substantial commercial value. Throughout said experimental period a large number of totally or partially unproductive animals must be maintained at considerable expense. During the taxable years 1956 through 1958, inclusive, virtually all of petitioner's personal attention was devoted to his farm operations, including the supervision of 12 full time employees, planning of breeding operations, and the maintenance of detailed breeding records. Gross revenues from the over-all operations of the farm, including milk production, during the taxable years ranged from about $83,000 to $91,000. From the commencement of his operation in 1948, and throughout the taxable period, petitioner sustained a considerable net loss from the operation of said farm. Petitioner did not use the farm as a hobby, or for recreation or entertainment. Held: The farm was operated by petitioner as a business regularly carried on for profit, and petitioner is entitled to deduct the expenses *278 and losses sustained during the taxable years in the farm operations under secs. 162(a) and 165(c)(1) of the 1954 Code. Jacob Rabkin, Esq., J. Harold Williams, Esq., 49 Pearl St., Hartford, Conn., and Robert M. Cipes, Esq., for the petitioners. J. Frost Walker, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Year
Amount
1956
$41,004.16 [1]
1957
36,064.11
1958
29,180.69
*279 The issues presented for our consideration are: (a) Whether petitioners are entitled to deductions as follows: $62,773.87, $65,568.54, $57,250.96 for the years 1956, 1957 and 1958, respectively, as losses from farming, under section 165(c)(1) of the 1954 Code; (b) $109.27 and $169.95 for the years 1957 and 1958, respectively, as long-term capital losses on the sale of farm machinery; (c) $1,211.59 for the year 1957 as a long-term capital loss on the sale of dairy cattle, and (d) $1,200.03 for the year 1958 as rebates with respect to sales of cattle made prior to 1958. Resolution of Issue (a), supra, in favor of petitioners will result in a similar holding as to the remaining issues. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners, John S. and Eleanor M. Ellsworth, husband and wife, filed joint Federal income tax returns for the taxable years ended December 31, 1956, 1957 and 1958 with the director of internal revenue for the district of Connecticut at Hartford, Connecticut. Eleanor is named *280 as a petitioner herein only because she filed joint income tax returns with her husband. From 1921 until the time of the instant trial the source of livelihood of John S. Ellsworth, hereinafter sometimes called petitioner, has been mainly dividend income and some interest income. Petitioner's occupation was that of farming from 1948 until the time of the instant trial. He had no other occupation during that period. Petitioner's farm known as "Folly Farm," consists of some 500 acres and is located in Simsbury, Connecticut. Part of the farm was acquired by petitioner in 1921. During the taxable years involved herein, petitioner was engaged in breeding purebred Jersey dairy cattle at his farm. This operation was commenced in the year 1948. When he started said enterprise in 1948, petitioner was already an experienced breeder of Jersey cattle having engaged in a prior breeding operation in the 1920s and 1930s. Petitioner's prior operation was terminated in 1940 in a dispersal sale at which he sold his entire herd of cattle with the exception of one blind cow, a bull of advanced years, and several young calves. Petitioner's primary reason for terminating his breeding operation in *281 1940 was due to the shortage of labor. From 1941 through 1947, petitioner was not active in Jersey cattle breeding. During that period his barns and several tenements were leased to a cattle farmer who also made use of petitioner's dairy building. Petitioner raised hay and silage and sold it to said tenant. During World War II, petitioner was engaged in organizing civilian defense work which took up a considerable amount of his time. When petitioner's tenant terminated his lease in 1947, petitioner was faced with the alternatives of allowing his farm of deteriorate, selling or renting it, or operating it himself. He chose the latter alternative. In 1947 and 1948 the demand for Jersey cattle and other breeds was very substantial, cattle and milk prices were high, and the general economic conditions of the cattle industry were very favorable. Petitioner was aware of these facts at that time. The purpose of a dairy cattle breeding operation is to make matings of selected animals in order to improve the productivity and longevity of the breed. The ideal purebred cow produces a large quantity of milk, is persistent in its production, and has a long life of usefulness. Petitioner *282 was seeking to achieve these qualities in his breeding program. The minimum amount of time required to prove a single bull or cow under normal circumstances would be 10 years and it would take from 12 to 15 years to prove a breeding herd. A breeding operation is carried out with the expectation of eventually selling breeding stock at substantial prices. Once the operation is established by developing a superior strain of livestock, a substantial revenue from such sales is expected because such animals are in high demand and sell at high prices. During the development of a breeding operation, a breeder normally purchases some animals at a substantial cost. Such purchases are necessary until such time as the breeder has made matings and achieved a top breeding establishment. Also, during the developmental period of a breeding establishment, sales of cattle are infrequent. Most breeding establishments sell relatively few cattle until after the first 8 to 10 years. Prior to the full establishment of the breeding herd, a breeder cannot realize maximum value on the sale of his cattle. Until the achievement of a top breeding establishment the costs of the operation will exceed its revenues. *283 Since the primary measure of the value of a dairy cow is its milk production history, such capacity must be recorded over a substantial span of time and during this experimental period a large number of totally or partially unproductive animals must be maintained at considerable expense. Petitioner was aware of these facts when he commenced his operation in 1948, and did not expect to make a profit during its early years. A cattle breeder will normally relate himself to a particular blood line or strain of cattle and emphasize that line in his breeding. The Sybil line is one of the top lines of Jersey cattle. Its chief characteristics are uniformity of type and above average milk production. Sybils are lower than the average Jersey cattle in the percentage of fat content in their milk. Shortly after starting his operation in 1948, petitioner decided that he would emphasize the Sybil line and develop a pure strain which would improve the Jersey breed. Commencing with an old bull, which carried the Sybil line, petitioner acquired foundation animals from time to time in order to achieve certain desired effects in his breeding. The highest number of cattle maintained by petitioner *284 during the course of his operation was 286. Of this number, about 106 were milking cows, the balance consisting of so-called "surplus stock" kept for purposes of the breeding operation. Throughout the course of his operation from 1948 until the time of the instant trial, petitioner maintained a scientific breeding program. Petitioner has discussed from time to time the operation of his breeding establishment with experts. The improvements on petitioner's farm include about 6 cow barns, 8 or 10 sheds and tool houses, several tenements for farm employees, and a building containing the farm office. During the taxable years petitioner had approximately 12 full time employees in addition to part time help. His staff included a herdsman who was in charge of (indoor) maintenance of the cattle; an individual in charge of (outdoor) maintenance of the farm and production of crops; and another employee who kept petitioner's books of account. Petitioner maintained records of the breeding history of all his cattle. He arranged and planned each breeding while he was at the farm. When petitioner was away, his indoor maintenance employee planned and arranged the breeding. Petitioner or his *285 employees also maintained detailed daily milking records for each milking cow on the farm. In addition, petitioner kept detailed records of the expenses of his operation, including charts analyzing the cost of milk produced and the cost of maintaining the animals held for purposes of breeding. The house in which petitioner lived was located on the farm. The farm or farm property was not used for entertainment purposes or social functions to any material extent. From the standpoint of economy and efficiency, petitioner's method of operations compares favorably to other similar breeding establishments. In 1948 when petitioner commenced his enterprise he was 65 years of age, and was 78 at the time of the instant trial. Petitioner's average working day on the farm was in excess of 8 hours. During the first few years of his operation, petitioner took no vacation. During 1952 through 1954, inclusive, he took brief vacations. Each year from 1955 to the time of the instant trial petitioner took a winter vacation in Florida primarily because of his wife's health. In each of the taxable years petitioner spent between two and one-half and three months in Florida. While in Florida, he *286 devoted a considerable amount of time to farm activities, maintaining close contact with the farm by telephone and mail. During his most recent Florida trip he engaged a secretary for about 105 hours to work on farm activities. Petitioner advertised in the breeding magazine of The American Jersey Cattle Club, a nonprofit association of owners and breeders of registered Jersey cattle. The club was organized for the purpose of improving the breeding and merchandising of Jersey cattle. The purpose of said advertisements was to picture in the public's mind the value of the Sybil line. The advertisements were in the nature of a dissertation on the breeding of fine cattle. They began in or prior to 1953. As far back as 1953, petitioner was an outstanding breeder of fine cattle. His cattle have won many records for production as well as for type. Petitioner had been successful also in the showrings, although he had not shown to the extent of many top breeders. His motivation for showing his cattle was to advertise his farm as a source of livestock. In recent years a number of factors have caused a decline in the demand for milk and milk products, particularly milk with a high fat content. *287 Among these factors are the tentative medical findings with respect to the effect of cholesterol on heart disease. The current dietary emphasis in the milk industry is upon the protein or nonfat content of milk. Although the milk pricing structure does not yet reflect payment for nonfat solids, there is a demand among milk distributors for cows which produce a high percentage of nonfat solids. Jersey milk, which petitioner sold during the period involved, is one of the highest, if not the highest of any type of milk in its percentage of nonfat solids. The sale of milk was purely incidental to petitioner's occupation of breeding Jersey cattle. In the taxable year 1958 and prior thereto he showed a small profit on the sale of milk. This was due to the fact that there was a market for "premium" or rich milk for which consumers and, therefore, distributors (to whom petitioner sold directly), were willing to pay a higher price. The market conditions for the sale of milk in Connecticut from 1958 until the instant trial have been highly unstable. The demand for premium milk has been virtually eliminated. As a result of a milk price war in Connecticut as well as the general depression *288 in the milk industry, petitioner's favorable contractual arrangement with a single milk dealer was terminated as of November 1, 1958, and petitioner ceased to receive premium prices for his milk. Consequently, from late 1958 until the instant trial, petitioner has not produced milk at a profit. Partly as a result of the foregoing developments, petitioner reduced the size of his milking herd in 1958 and 1959. Petitioner's operation has also been adversely affected by a serious flood which Connecticut suffered in 1955, and a severe drought in 1957 which required the State Legislature to enact relief measures. Generally, a breeder who has successfully developed a superior strain will be able to realize high prices for his livestock. It is recognized by the cattle breeding industry that because of the losses necessarily involved, many breeders give up their activities after only seven years of operations. Premature termination of a breeding operation, prior to completion of a planned breeding program, is economically unfeasible. During the early years of his operation petitioner's revenues from the sale of cattle were insubstantial. In the course of developing his breeding herd, *289 petitioner did not sell his valuable foundation stock. Petitioner could not have changed his method of operation in order to make an immediate profit in the early years without sacrificing the goal of his entire undertaking. The life of the average commercial dairy cow is from three to four years. Petitioner has been successful in breeding cows with a consistency of milk production and a long life span of productivity beyond the usual age. His herd has the greatest concentration of Sybil blood of any herd in the United States. No line of cattle has been developed to the degree of purity that petitioner has developed in the Sybil line. Petitioner's foundation breeding stock consists of 30 to 40 cattle. During 1953, petitioner's herd was becoming one of the top breeding establishments in the country. In 1960, petitioner held a sale which was the third highest farm sale of Jersey cattle in the United States for that year based upon the average selling price per head. Said sale did not represent petitioner's top cattle, but consisted primarily of "young stock." The sale was composed of 56 head of cattle at an average price of $379.20 per head. One of the most significant developments *290 in the field of cattle breeding in the last 10 or 15 years is the phenomenal increase in the use of artificial insemination. It has enhanced the value of strong pedigrees and offers a great premium for highly selected bulls. Artificial insemination is carried on by about 52 or 62 "bull studs" in various parts of the United States. There are approximately 384 Jersey bulls in service in these establishments. Some of these establishments will pay $50,000 or more for the ownership of a bull stud. Petitioner has had substantial income from dividends in every year since he commenced his breeding operations. Shortly after petitioner reentered the field of cattle breeding in 1948, it became evident to him that he might offset farm losses against his dividend income. Without this factor petitioner would not have pursued his occupation. Petitioner's farm operations have thus far shown annual net losses for tax purposes. Expenses incurred by petitioner, however, have resulted in the establishment of a very valuable herd of cattle. In each of the taxable years petitioner's cattle for breeding purposes were worth approximately $250,000. During the taxable years, expenses and losses of petitioner's *291 operations, after rising in a pyramiding fashion, had begun to decline. Gross revenues from the over-all operations of the farm ranged from about $83,000 to $91,000 during the taxable years. Proceeds from the sales of cattle in the taxable year 1958 were approximately double those of 1957. Petitioner has reduced the size of his farm by terminating his lease of a neighboring farm in 1958, and has reduced his working area further by renting some of his land to a tobacco grower. A comparison of petitioner's gross profit with his expenses in connection with his dairy cattle breeding occupation is as follows: Gross Profit
Deductions
Loss Claimed
from Sched-
from Sched-
from Sched-
Taxable
ule F of
ule F of
ule F of
Year
Gross Profit
Return
Return
Return
1948
$25,068.79
($ 46,386.05)
($21,317.26)
1949
38,053.04
( 79,884.47)
( 41,831.43)
1950
$53,014
43,764.57
( 89,992.28)
( 46,227.71)
1951
56,195
55,776.30
( 100,960.87)
( 45,184.57)
1952
65,596
58,961.56
( 115,764.77)
( 56,803.21)
1953
$70,576
$67,504.58
($121,899.16)
($54,394.58)
1954
78,759
76,786.99
( 131,792.87)
( 55,005.88)
1955
89,157
94,309.82 *
( 143,736.20) *
( 49,426.38) *
1956
97,198
83,066.40
( 157,120.09)
( 62,773.87)
1957
89,940
91,260.12
( 156,828.66)
( 65,568.54)
1958
87,418
87,080.33
( 144,331.29)
( 57,250.96)
1959
55,475
55,153.13
( 129,424.92)
( 74,271.79)
1960
62,419
55,324.43
( 123,381.37)
( 68,056.94)
*292 Each year from 1948 to and including 1960, petitioner, to a considerable extent, offset substantial dividend income with alleged farm losses as follows: Taxable
Income From
Farm Loss
Adjusted Gross In-
Year
Dividends
Claimed
come Reported
1948
$ 68,081.11
($21,317.26)
$57,110.20
1949
75,175.91
( 41,831.43)
39,690.32
1950
111,230.87
( 46,227.71)
87,736.51
1951
86,818.37
( 45,184.57)
57,895.27
1952
86,096.70
( 56,803.21)
43,354.79
1953
90,382.00
( 54,394.58)
45,244.03
1954
107,386.15
( 55,005.88)
59,478.36
1955
128,179.19
( 49,426.38) *
97,069.73 *
1956
128,025.76 *
( 62,773.87)
68,293.17
1957
124,346.94
( 65,568.54)
67,526.32
1958
118,846.00
( 57,250.96)
71,141.73
1959
127,392.13
( 74,271.79)
76,571.61
1960
128,770.60
( 68,056.94)
65,541.38
A comparison of farm expenses, deductions, and losses claimed by petitioner each year from 1948 to 1960, inclusive, with petitioner's gross revenue from the sale of cattle is as follows: Total of Capi-
Total Non-
tal and Non-
Total Capi-
capital
capital
tal Assets
Assets
Assets
Year
Sold
Sold
Sold
1948
1949
1950
$12,815.00
1951
10,450.31
$ 4,053.88
$14,504.19
1952
15,149.68
3,419.67
18,569.25
1953
9,930.20
5,708.32
15,638.52
1954
10,136.66
4,497.49
14,634.15
1955
9,596.37
1,686.74
11,283.11
1956
15,828.89
1,800.54
17,629.43
1957
13,160.74
4,475.65
17,636.39
1958
22,111.80
12,630.96
34,742.76
1959
18,384.00
7,904.33
26,288.33
1960
35,974.48
7,439.45
43,413.93
*293 Farm Expenses
Farm Deductions
Loss Claimed
Schedule F
Schedule F
Schedule F
Year
of Return
of Return
of Return
1948
($ 36,968.19)
($ 46,386.05)
($21,317.26)
1949
( 58,089.72)
( 79,884.47)
( 21,831.43)
1950
( 69,316.95)
( 89,992.28)
( 46,227.71)
1951
( 79,391.91)
( 100,960.87)
( 45,184.57)
1952
( 93,501.82)
( 115,764.77)
( 56,803.21)
1953
( 100,009.48)
( 121,899.16)
( 54,394.58)
1954
( 114,144.45)
( 131,792.87)
( 55,005.88)
1955
( 124,657.82) *
( 143,786.20) *
( 49,426.38) *
1956
( 139,904.37)
( 157,120.09)
( 62,773.87)
1957
( 143,400.25)
( 156,828.66)
( 65,568.54)
1958
( 132,192.98)
( 144,331.29)
( 57,250.96)
1959
( 119,266.36)
( 129,424.92)
( 74,271.79)
1960
( 114,706.07)
( 123,381.37)
( 68,056.94)
In each of the taxable years involved petitioner had a reasonable expectation of eventually realizing a profit from his farm operations. During said period the farm was operated by petitioner as a trade or business within the meaning of the Internal Revenue laws. Opinion The principal question for our decision is whether the activities of petitioner with respect *294 to the operation of Folly Farm, and particularly the breeding of dairy cattle during the taxable years 1956, 1957 and 1958, constituted a business within the purview of section 162 of the 1954 Code. An affirmative answer carries with it the right to deduct the expenses [2] of his operation and the losses [3] sustained during said period. [4]
*295 Whether the activities of a taxpayer constitute carrying on of a trade or business within the intendment of the statute during the taxable years involved is primarily a question of fact, and the intention of the taxpayer is controlling. Morton v. Commissioner, 174 F. 2d 302-307 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court. In ascertaining that intention, the existence of a profit motive on the part of the taxpayer is requisite. If a taxpayer operates a farm with the true intention and reasonable expectation of eventually making a profit, and not merely as a place of pleasure, exhibition, and social diversion, the fact that there has been a long series of losses sustained from the operation thereof, while undoubtedly a material factor for our consideration, does not of itself change the character of the enterprise from one operated for profit to a hobby. Commissioner v. Field, 67 F. 2d 876, 878 (C.A. 2, 1933), affirming 26 B.T.A. 116, 123 (1932); Thacher v. Lowe, 288 Fed. 994-995 (S.D.N.Y. 1922); Dean Babbitt, 23 T.C. 850, 868 (1955); Norton L. Smith, 9 T.C. 1150, 1154 (1947); James Clark, et al., Executors, 24 B.T.A. 1235, 1239 (1931), *296 acq. C.B. XI-1, 2 (1932) G.C.M. 21103, C.B. 1939-1, 163. Cattle breeding, though a financially hazardous undertaking, has been repeatedly classified as a business under the revenue laws. See Margaret E. Amory, 22 B.T.A. 1398-1399 (1931), acq. C.B. X-2-3 (1931); George D. Widener, 8 B.T.A. 651, 658 (1927), affd. 33 F. 2d 833 (C.A. 3, 1929). In essence, respondent contends that petitioner has been a "top breeder" of cattle for many years and "never expected to make a profit." Respondent does not specifically argue that Folly Farm was operated by petitioner as a hobby, but the gist of his argument is that the evidence of substantial and continuous losses in the farm operation in excess of occupational income year after year, when considered in connection with petitioner's great scientific interest and enjoyment in cattle breeding, demonstrates that his desire and expectation of ultimate profit was subordinate to his personal pleasure in breeding livestock, and, hence, the operation was not a business within the ambit of the statute. Contesting respondent's view, petitioner contends that from the commencement of his reentry of *297 dairy cattle in 1948, his predominant desire was to make a profit therefrom but that he recognized there was a necessary developmental period of several years during which expenses would inevitably exceed income. [5]
For reasons hereinafter stated, we are convinced that at all times during the period involved it was petitioner's intention to operate the farm as a business for ultimate profit, and that he had well defined and reasonable expectations of accomplishing that result. Petitioner testified that he would not have reentered the breeding of dairy cattle in 1948 unless he "felt sure" he could make a profit, although, based on his past experience in breeding livestock, he realized that initial losses were inevitable since it would require about 10 to 15 years to develop superior strains in his Sybil cattle so that they would have substantial commercial value. Petitioner also ascribed his continuous losses from his farm enterprise in *298 part to various causes such as climatic conditions, adverse effects on breeding establishments of artificial insemination, and economic depressions in the milk industry. Notwithstanding these latter factors, which were beyond his control, petitioner had more than a vain hope that a profit would result from his venture in the near future which would justify his expenditures. The record shows that petitioner's operation was conducted on an efficient, economical and sound scientific basis when compared to other breeding establishments; that the blood lines of his herd have been constantly improving; and that the prospects of making a profit from the sale of his cattle are considerably improved. Petitioner's expectation of realizing a profit in the very near future was corroborated by three experts in the breeding of livestock who testified, in general, as to the potential profit represented by petitioner's foundation herd, particularly in the "bull stud" market for use in artificial insemination establishments. J. F. Cavanaugh testified that petitioner's cattle "have arrived at a point where we think they would sell to good advantage." Likewise, Parodneck, another expert, testified *299 that an individual who had a breeding herd during the taxable years involved, had "a reasonable expectancy of making a profit." We found their testimony in this respect convincing. In this connection, it is noteworthy that although milk production was a by-product of his breeding experiment, in each of the taxable years, petitioner grossed in excess of $60,000 from the sale of milk. Admittedly, petitioner possessed an independent income and was not dependent on the success of the farm for a livelihood. He also may well have pleasure from residing in a country home, but these facts alone do not negate his intent to operate the farm for profit. Wilson v. Eisner, 282 Fed. 38 (C.A. 2, 1922); DuPont v. United States, 28 F. Supp. 122, 124 (D. Delaware, 1939) (C.A. 2). Nor is such intent vitiated by the fact that petitioner received an annual income from dividends sufficient to offset substantial losses from his farm enterprise. No evidence was adduced that petitioner was indifferent to whether there was a loss or gain, or that the farm was an incident to the social or domestic aspects of his life. A substantial income from sources other than farming, or substantial *300 sources of capital, was necessary as a basis for embarking on the farming project because of anticipated losses in the earlier years. We have no doubt upon the record that petitioner devoted himself assiduously to the economical operation of the farm with the reasonable hope of substantial future profits from the breeding operation. We further note that petitioner took affirmative steps to minimize losses derived in 1958 by reducing his herd, terminating his lease of a neighboring farm and reducing his working area further by renting some of his acreage. We are satisfied that all of his activities at the farm were influenced by the ambition to produce a valuable strain of dairy livestock which would be commercially acceptable. That petitioner was about 65 years of age in 1948 when he commenced his selective breeding enterprise and would be 75 or 80 before he could make a profit, in our opinion, is not determinative of the issue. More significant, we believe, is the fact that he gave such attention to the farm as is usually given to a business enterprise. Apart from his annual vacation, petitioner devoted virtually all of his personal attention to supervising the farm operations, *301 including a staff of several full time employees who assisted him. Petitioner, whose average working day on the farm was in excess of eight hours, performed all of the functions of a farm manager. During the taxable years involved, detailed records were kept of daily milk production, of statistics relating to the breeding activities of his livestock, and of income and expenses attributable to the operation of the farm. The farm was a well equipped establishment and was operated in a businesslike manner. We find, on the whole picture, that the farm operation was not carried on for the purpose of display, social diversion, or for the gratification of a personal whim. Samuel Riker, Jr., Executor, 6 B.T.A. 890, 893 (1927). Henry P. White, 23 T.C. 90 (1954), affd. 227 F. 2d 779 (C.A. 6, 1955), cited by respondent, is inapposite. Unlike the instant case, in White, receipts were negligible, bookkeeping was not maintained in a businesslike manner, and there was no explanation for the initial period of losses. Considering all of the evidence we hold that petitioner carried on his farm activities, and particularly his breeding operations, on a commercial *302 basis with the reasonable hope of making it profitable and not for his recreation, pleasure or other personal reason. Accordingly, the expenses in question are deductible under section 162(a), supra. In view of our holding hereinabove, petitioner is also entitled to deduct the rebates in dispute with respect to sales of cattle made prior to 1958 in the amount of $1,200.03 as an ordinary and necessary expense of his business. Plymouth Brewing & Malting Co., 16 B.T.A. 123, 128 (1929). Likewise, petitioner is entitled to deduct the long-term capital losses in controversy under section 165(c)(1) of the 1954 Code. Decision will be entered under Rule 50. Footnotes
1. Since the sum of $5,505.37 was paid with an amended return by petitioners, the amount in dispute is $35,498.79.↩
*. Corrected copy of return.↩
*. Corrected copy of return.↩
*. Corrected copy of return.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *↩
4. Income Tax Regs. Sec. 1.162-12. Expenses of farmers. A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. * * * If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions. * * *↩
5. Congress has expressly recognized that there may be developmental business losses in the amounts sustained by petitioner, and in larger amounts. (See Section 270 of the 1954 Code; James M. McDonald, 23 TC 1052, 1056↩ (1955).)