SAMUEL R. DELL AND ELEANOR DELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dell v. Commissioner
Docket Nos. 11187-81, 29871-82.
United States Tax Court
T.C. Memo 1984-556; 1984 Tax Ct. Memo LEXIS 118; 48 T.C.M. (CCH) 1430; T.C.M. (RIA) 84556; October 17, 1984. *118 Held, petitioners' cattle breeding operating was an activity engaged in for profit during 1977 and the first half of 1978 and the expenses incurred in this activity are, therefore, fully deductible. Heldfurther, petitioners' second cattle breeding operation was not an activity engaged in for profit and deduction of expenses during the second half of 1978, 1979 and 1980 are, therefore, limited in accord with sec. 183, I.R.C. 1954. Gerald W. Dibble and David H. Kernan, for the petitioners. Michael Sheeley, for the respondent. WHITAKER MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1977
[1] $29,044.58
1978
15,145.00
1979
8,317.00
1980
6,790.00
The only question before the Court is whether petitioners' cattle breeding operation was an activity "engaged in for profit" *119 during the years in issue. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. [2]
Petitioners Samuel R. and Eleanor Dell, husband and wife, were legal residents of Camillus, New York, when their petitions in this matter were filed. [3] *120 In each of their joint Federal income tas returns for the years 1977 through 1980, petitioners claimed deductions for losses incurred in their cattle breeding operation. By notices of deficiency, respondent advised petitioners that such deductions were not allowable under section 183[4] since the losses were not generated by an activity engaged in for profit. Petitioner Samuel R. Dell (Dell) initially became interested in the cattle breeding business in 1972 or 1973 when he attended a meeting where the speaker talked about the advantages of the cattle business while trying to sell interests in a Texas cattle breeding operation. This description of the cattle business, and Dell's perception that such a business could be profitable, encouraged him to consider beginning a cattle operation on a 194-acre parcel of land in Camillus, New York, acquired by petitioners in 1961. Petitioners' personal residence, with improvements such as a 2-acre pond, a swimming pool, pool house and tennis court, and petitioners' son's family residence, occupied approximately 8 acres of the Camillus property during the tax years *121 in issue.The balance of the property consisted of corn lots, pasture fields and a 25-acre wood lot. Dell anticipated using the approximately 160 acres of corn lots and pasture fields for the cattle operation. [5] Prior to 1973, petitioners had not farmed or conducted any business on the Camillus property. Dell had no experience or education in the cattle business. He sought advice from a friend who had a purebred Angus cattle farm and, through this friend's foreman, Dell was put in touch with a Samuel Miner (Miner). At that time, Miner was employed by a purebred Angus and feedlot cattle operator as a show herdsman and day-to-day manager of the operation. Miner had approximately 9 years' experience as a herdsman in purebred cattle businesses, 8 of which were with the Angus breed of cattle, a 2-year Associate Degree in Animal Husbandry from a state agricultural College and was a member of the Board of Directors of the New York State Angus Association. In August 1973, Miner visited the Camillus property to discuss *122 starting and maintaining a cattle operation there. During this visit and in other conversations, both before and after the visit, Dell and Miner jointly formulated a general plan for Dell's cattle operation, the d Six Angus Farms. Based on the resources available, the d Six Angus Farms would be a purebred cattle breeding operation. Such an operation produces high quality purebred cattle for sale to other breeding farms as replacements in their permanent herds and to commercial calf-producing farms. The quality of purebred breeding cattle is judged on the basis of their size, temperament, reproduction capabilities and other genetic characteristics such as confirmation and structural correctness. High quality purebred breeding cattle are developed by breeding high quality cows with high quality bulls and by taking good care of the offspring. Typically, a cattle breeder will maintain a permanent herd of mother cows that is continuously upgraded in quality by retaining or purchasing high quality offspring to replace old or inferior animals. The success of a purebred cattle breeding operation, such as the one envisioned by Dell, is dependent upon the reputation of the bloodline that *123 is produced.Bloodline is established through a combination of the animals' performance record (breeding record) and show record. While some commercial or feedlot-grade cattle are unavoidably produced by purebred breeding operations, their production and sale are only incidental to the operation. The overriding objective is to produce registered purebred cattle which can command substantially higher prices than commercial-grade stock. As planned, the d Six Angus Farms was to consist of a permanent herd of approximately 40 registered purebred Angus cattle, the offspring of which would eventually be marketed at the state and national level. The target of a 40-head permanent herd size was based on the carrying capacity of the Camillus property. The Angus breed was selected based on Miner's experience with the breed and his view that they were better mother cows than other breeds, thattheir saleability would be higher in the area of New York in which the d Six Angus Farms was located, and that the New York State Angus Association was active and would help a new Angus enterprise. [6] *124 The 2 most common methods of starting a purebred breeding herd are: (1) To make a large initial investment in the purchase of top quality, proven cows and bulls; or (2) to make a smaller initial investment by purchasing, on a speculative basis, open heifers [7] and bulls of a less proven quality and bloodline but with good potential as breeding animals. On Miner's recommendation, the second method was adopted, a major factor being the lower initial investment required. In planning the operation, Miner advised Dell that it would take 8 to 10 years for the purebred cattle breeding operation to generate any profits. Such a lag between the start of the business and its profitability is not unusual for a purebred cattle operation. During the "start-up" phase, the physical facilities are built and a quality permanent hard is assembled through purchase and breeding. Miner was confident that Dell's cattle operation would eventually *125 be profitable, in part, because he expected that certain other Angus breeding operations in the area would wind down their businesses and the d Six Angus Farms would be able to absorb their established clinentele for purebred Angus calves. Dell also believed that the d Six Angus Farms would ultimately be profitable. His optimism was based solely on reading a few books on Angus cattle, having heard of Angus bulls selling for as much as $150,000 and his conversations with Miner. No projections or analysis of the potential profitability of the proposed venture were done nor did Dell decide on any definite amount of investment that he intended to make in the cattle operation. In 1973, Dell was the major shareholder and chief operating officer of Sam Dell Dodge Corporation, an automotive sales and service business in Syracuse, New York, approximately 10 miles from Camillus. For part or all of the period 1973 through 1982, Dell also owned 7 other automobile dealerships located in New York, Georgia, Virginia and Massachusetts, and a realty company in New York. [8] *126 Dell spent an average of 6 days per week engaged in these business ventures. [9]
By reason of his lack of time for a new venture, as well as his lack of knowledge or experience concerning the purebred cattle business, Dell hired Miner to work as the full-time ranch manager/herdsman of the d Six Angus Farms. Miner worked in this capacity from October 1973 until May of 1978, putting in approximately 6-1/2 days per week. During this period, Miner had a part-time assistant to help him with the farm and cattle work. Miner's initial compensation consisted of $200 per week, the use of a pickup truck and a house about 7 miles from the Camillus property, which house petitioners purchased for his use. With exception of major financial decisions which were made by Dell, Miner was responsible for, and made, all of the decisions concerning the organization and operation of the d Six Angus Farms. His responsibilities included construction of the *127 physical facilities, raising crops used as cattle feed, purchasing equipment and supplies, locating high quality animals to be purchased to start the permanent herd and selecting the higher quality cattle to be retained or sold as registered animals, and identifying the poorer quality animals to "cull" from the herd. The 40-head permanent herd was to be established by purchasing 8 to 10 quality, proven cows with the balance of purchases being of open heifers. Miner selected the best animals he could locate within the price range Dell set. Between October 1973 and October 1975, 42 head of registered purebred cattle were purchased for approximately $30,000. No cattle purchases were made after 1975. As noted, Miner was responsible for selecting the cattle to be culled from the herd to improve its overall quality. The criteria used in selecting animals included the fertility of the cow, its structuralsoundness and whether it was a good milker and mother. Four to 5 years' experience are required to enable a person to recognize a good quality animal. Failure to cull out poorer animals over a number of years results in a large percent of below-average cattle in a herd and considerably *128 reduced saleability of the herd as a whole.Culled animals are generally sold at commercial prices that are substantially lower than the prices of quality registered animals. Of the cattle purchased to establish the d Six Angus Farms, 12 were subsequently culled. Fifty-nine of the 134 calves born at d Six Angus Farms during Miner's tenure were also culled and sold at commercial prices. [10]
To be sold as a purebred Angus, an animal must be registered with the American Angus Association (Association). To register an animal, a person must be a life member of the Association and must provide detailed information about the specific calf. [11] Only offspring of registered animals can be registered. In January 1974, Dell purchased a lifetime membership in the Association so that Miner could register all calves born on the d Six Angus Farms that were retained as herd replacements or sold as registered animals, i.e., 38 calves. Miner generally registered calves 6 to *129 7 months after birth. The information required for registration was obtained from records maintained by Miner from 1973 through 1977. In addition to registration information, Miner's records also recorded calving dates, breedback information, pasture movement information, additional notes about each animal, each animal's ear tag number, notes of expenditures and receipts, and other relevant information concerning the cattle operation. [12]
To improve the quality of the d Six Angus Farms herd, 6 cows were artificially inseminated in 1977. Since this is an expensive technique, it was not used in earlier years. *130 Miner viewed 1974 through 1977 as a "shake-down" period during which he identified the best cows for which artificial insemination was cost justified. During the initial years of a purebred cattle breeding operation, one must develop a clientele as well as a reputation for producing quality animals which are specifically identified with the operation. From 1973 through 1977, the d Six Angus Farms' advertising consisted of hosting 2 open houses to which other breeders and farmers were invited, attending cattle sales and shows, use of a business card, and visiting other purebred breedingoperations. [13] Additionally, 2 of petitioners' cattle, only one of which was bred on the d Six Angus Farms, were shown at 2 cattle shows. Dell did not advertise the d Six Angus Farms in any trade journals because, during its formative years, it did not have top quality cattle to sell which would justify the cost of such advertising. From 1973 through *131 1977, the only income generated by the d Six Angus Farms was from local cattle sales which were generally of commercial-grade cattle. A few sales of individual purebred animals were also made during this period: 4 in each of the years 1974, 1975 and 1977, and 15 in 1976. [14] From 1974 through 1977, the market for purebred Angus cattle was in a severe depression which reduced the prices at which purebred animals could be sold. The market for commercial cattle was also depressed during this period; thus low prices were obtained for animals culled from the d Six Angus Farms herd. These depressed prices intensified the annual losses of petitioners' cattle operation during the developmental years. During 1976 and 1977, Dell and Miner had frequent discussions about how to contain costs and made strenuous efforts to minimize losses. Finally, in 1977, Dell reached a point where he was no longer willing to continue to incur losses and decided to terminate the cattle operation. By this time, *132 the operation had generated losses of $168,430. Dell did not consider selling the d Six Angus Farms as an ongoing business since he was unwilling to sell the Camillus property. Instead, on December 15, 1977, he ordered Miner to sell the entire herd. The cattle liquidation actually began in January 1978 when Miner circulated a letter to prospective buyers. In May of 1978, 52 head of the cattle were sold for $21,477.[15] After these sales, 7 coes, with calves, remained on the Camillus property. The purchasers of the other cattle had refused to buy these cows because of physical deficiencies or, in one case, the unregisterability of the calf.[16] Miner made 2 or 3 additional, unsuccessful attempts to sell these animals prior to terminating his employment. By the end of 1977, in addition to livestock, petitioners had invested approximately $90,000 in capital assets *133 used in their cattle operation for which they had taken depreciation deductions of approximately $26,000. No attempt was made to sell any of these assets despite the fact that many, such as the Whedon Road house, a tractor and other farm equipment, were not part of, or attached to, the Camillus property. Instead, Dell decidedthat, using these assets and the 14 cows and calves which Miner had been unable to sell, he would employ the natural increase method to build a purebred herd of approximately 200 head. [17] *134 The natural increase method involves no culling of poorer quality animals. Dell has not used artificial insemination or purchased any cattle to improve the quality of the herd. The cows remaining after the liquidation sale have merely been pastured with a bull so that breeding can occur. Petitioners' herd size increased from 14 to 28 between June 1978 and June 1983. [18] Petitioners' primary objective since mid-1978 has been to develop a cattle operation with little or no expense. [19] Despite Dell's lack of the knowledge or experience necessary to run a purebred cattle operation, [20] *135 and thetime demands of his automobile dealerships, Dell did not hire a ranch manager/herdsman. Instead, he has employed 6 different farmhands, part-time, to do basic farm chores. [21] None of these farmhands had any prior experience with a purebred cattle operation and, with the exception of the most recent, Donald Bloeser (Bloeser), none maintained any records concerning the cattle operation. [22] The only records petitioners personally kept concerning either of their cattle operations are financial, i.e., they have retained check stubs, canceled checks and bank statements concerning the separate checking account they used for cattle activities and have kept a receipt book reflecting income from cattle sales. [23] Petitioners never personally kept any breeding and after May 1978, no contemporaneous records of cattle production and disposition were maintained. *136 Between May 1978 and June 1983, no calves were registered by petitioners and the only advertising done concerning the cattle operation was 2 local advertisements for commercial steers. During this period, only 3 head of commercial grade cattle were sold. In 1980 petitioners purchased 300 acres adjoining the Camillus property which they had been trying to buy for 15 years. At the time of trial no cattle-related activity was conducted on this land and petitioners do not plan to begin such activities on the property until the cattle operation is profitable enough to pay for the required fencing. Petitioners have used their income from other sources, reflected in the following table, to finance their cattle breeding activities. As indicated, petitioners have realized little income from the sale of cattle and have suffered net losses from their cattle breeding activities each year. Income From
Losses from Cattle
Sources other
Income from
Operations as
than Cattle
Sale of
Reported on
Year
Operations
Cattle
Schedule F
1973
[24] *137 ($9,778)
1974
$100,079
(35,773)
1975
128,934
$4,471
(37,389)
1976
186,704
4,732
(44,949)
1977
196,382
6,537
(40,541)
1978
288,756
[25]
(31,167)
1979
257,044
(17,298)
1980
295,115
535
(13,580)
1981
294,340
4,728
(4,331)
1982
228,740
(1,219)
In 1980 through 1982, petitioners reported as income from their cattle activities the following rental income from the Whedon Road house, the barn apartment and lease of crop land: [26]
1980
$1,650
1981
8,760
1982
13,185 OPINION In each of the years in issue, petitioners sustained net losses from their purebred cattle breeding activities. The only question before us is whether these activities were "not engaged in for profit" within the meaning of section 183 thereby limiting deduction of these losses. [27] *138 Sections 162 and 212(1) and (2) permit full deduction of *139 all ordinary and necessary expenses paid or incurred in carrying on a trade or business or in the production of income. However, an activity does not rise to the level of the carrying on of a trade or business under section 162(a) nor are expenses incurred for the production of income under section 212(1) or (2) unless the activity is engaged in with the intent of realizing a profit. Brannen v. Commissioner,78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Where not engaged in for profit, deductibility under thesesections, however, is limited by section 183 which provides that, if an activity is "not engaged in for profit," deduction of expenses is essentially limited by the amount of income generated by the activity. To fully deduct expenses under either section 162 or 212, therefore, an individual must be prepared to demonstrate an associated profit motive. While profit need not be the sole motive in undertaking or continuing an activity, it must be predominate or overriding. Lemmen v. Commissioner,77 T.C. 1326 (1981); Eastman v. United States,635 F.2d 833 (Ct.Cl. 1980); Allen v. Commissioner,72 T.C. 28 (1979); Dunn v. Commissioner,70 T.C. 715 (1978), affd. *140 on other grounds 615 F.2d 578 (2d Cir. 1980). The taxpayer bears the burden of proving that the requisite profit motive exists. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In carrying this burden the taxpayer need not demonstrate that his expectation of profits was reasonable, but only that he held an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The determination as to whether an activity is engaged in for profit is made on the basis of all of the facts and circumstances. Allen v. Commissioner,supra;Eastman v. United States,supra.Greater weight, however, is given to objective facts rather than to statements by the taxpayer concerning his motive. Engdahlv. Commissioner,72 T.C. 659 (1979); Golanty v. Commissioner,supra.
The regulations under section 183 identify 9 factors, derived from prior case law, which are to be considered in determining whether the requisite profit motive is present. These factors are: (1) The manner in which the taxpayer carried on the *141 activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs. In deciding whether the requisite profit motive exists in any case, the presence of one, or even a majority, of these factors is not determinative. Benz v. Commissioner,63 T.C. 375 (1974); Golanty v. Commissioner,supra.
In determining whether petitioners' cattle breeding activities were engaged in for profit, we agree with petitioners that 2 separate and distinct "businesses" should be examined: one commencing in 1973 which was liquidated in mid-1978 and the second which commenced inJune 1978 and continues to date. [28] Applying the criteria discussed above, we hold that petitioners' cattle *142 breeding activities during 1977 and the first half of 1978 constitute a business engaged in for profit and expenses incurred by this business were fully deductible. In contrast, we hold that petitioners' cattle breeding activities from mid-1978 through 1980 were "not engaged in for profit" and deductibility of expenses are, therefore, limited by section 183(b). Petitioners' Purebred Cattle Breeding Business: 1973 through May 1978
From 1973 through mid-1978, petitioners' cattle breeding activities were conducted in a manner indicating the presence of a profit motive. The manner in which the physical facilities and permanent herd were procured and developed was consistent with customary practice in establishing and conducting this type of business. Pointing to the scant trecords relating to the cattle breeding operation maintained by petitioners, respondent asserts that such operation was not conducted in a businesslike manner. While petitioners personally maintained only limited financial rcords, in conjunction with the detailed records maintained by Miner, the scope of record keeping was sufficient *143 under the record herein for this business. Respondent also argues that petitioners' cursory preparation prior to initiating their cattle business indicates the lack of a profit motive. While greater preparation and planning may have been desirable, the general plan formulated by Dell and Miner was sufficiently detailed to establish and conduct the business throughout its 4- to 5-year existence. In evaluating the taxpayer and his advisers' expertise, respondent asserts that petitioners' reliance on Miner's expertise was misplaced, arguing that he had no prior experience in starting a purebred cattle operation and chose a "speculative" method to establish a permanent breeding herd. We find that petitioners' reliance on Miner's expertise and knowledge was not without justification. When consulted and retained by petitioners, Miner held an Associate Degree in Animal Husbandry, had approximately 9 years' experience in purebred cattle breeding, had previously been responsible for the day-to-day operation of such a business and was a member of the Board of Directors of the New York State Angus Association. The method employed by Miner to establish the permanent breeding herd was not uncommon *144 in this type of business. Nothing in the record indicates that Miner failed to conduct petitioners' business in an entirely professional manner throughout his tenure or that his advice was in any significant respect disregarded by petitioners. The fact that petitioners devoted little of their time to their cattle breeding activities does not, by itself, negate the existence of a profit motive. Section 1.183-2(b)(3), Income Tax Regs.; Babbitt v. Commissioner,23 T.C. 850, (1955). They retained experienced full-time and part-time employees to operate their business. Similarly, the fact that throughout the period it operated, petitioners' first cattle business generated losses is not inconsistent with the existence of a profit motive. The 8-to 10-year start-up period before profits could be expected envisagred by Miner, and about which he cautioned Dell, is not unusual for this type of venture. Engdahl v. Commissioner,supra. The fact that Dell became impatient and terminated the business before it could be expected to generate any profits does not retroactively negate the presence of the requisite profit motive. Respondent also contends that petitioners' substantial income from *145 other sources indicates that their motive in undertaking their cattle breeding activity was to reduce their taxes rather than to generate profits. Although income from other sources allowed petitioners to continue an unprofitable business without lowering their standard of living, this factor alone does not indicate that a profit motive did not exist. Jasionowski v. Commissioner,66 T.C. 312 (1976). Finally, respondent points to the personal pleasure Dell derived from the Camillus property as an indication that petitioners' primary motive was not profit. In weighing this factor, we note that the portion of the property used in the cattle operation was physically distinct from that used for personal pursuits and that nothing in the record indicates that elements of personal pleasure or recreation had any influence on petitioners' decision to begin or continue their cattle business. Based on all of the facts and circumstances, [29] *146 we conclude that petitioners' first purebred cattle breeding operation was engaged in for profit. All losses generated by this business, therefore, are fully deductible. Petitioners' Purebred Cattle Breeding Activities: June 1978 through 1980
Considering all of the facts and circumstances, we find that from mid-1978 to trial the requisite profit motive did not exist as to petitioners' cattle breeding activities. The primary motive in this operation was to limit the expenses inherent in owning purebred cattle, not the realization of profits. Indicative of the lack of a profit motive is the unbusinesslike manner in which the second purebred operation was conducted. Petitioners did no planning, analyses or projections before embarking on a new venture despite the substantial losses they had already suffered in purebred cattle breeding. They merely took the cattle Miner had been unable to sell and, using the natural increase method, intended to build a permanent herd of approximately 200 head. Although the success and profitability of a purebred cattle operation is dependent on establishing a reputation as a breeder of high quality cattle, petitioners: (1) Took no steps to insure or improve the quality of their herd, the very foundation of which was of questionable quality; (2) made no attempt, and in fact *147 did not know what was required, to register new calves; and (3) made no attempt to develop a business reputation or clientele. The fact that financial records used solely to complete Federal tax returns were maintained does not necessarily indicate that petitioners' cattle breeding operation was conducted in a businesslike manner. Eastman v. United States,supra at 840. These records were never used to evaluate the performance of the operation to date or to determine how to increase profits or reduce expenses in the future. Petitioners maintained no detailed contemporaneous records of their cattle operation which could be used in future planning or to register cattle. [30] *148 The scanty notation of calf births made by Bloeser for 1981 and 1982, in conjunction with petitioners' financial records, also do not constitute sufficient records for a purebred cattle breeding business. The lack of adequate records is but a further indication of the unbusinesslike manner in which petitioners conducted this operation. Petitioners did not consult with or hire anyone with any expertise or experience in starting or conducting their second purebred cattle operation.Instead, they argue that Dell was qualified to independently supervise the new business because he had had the benefit of working with Miner and supervising a purebred cattle operation for 5 years. Dell's involvement in "supervising" the original business was limited to major financial decisions. Miner had been responsible for, and independently made, all other decisions relating to that business. It is inconceivable, given his limited involvement in the day-to-day operation of petitioners' first cattle operation, that Dell had developed the expertise required to supervise a purebred cattle breeding business. Dell devoted, at most, one-half a day per week to petitioners' cattle breeding activities. In contrast to the first operation, however, petitioners did not hire the full-time, experienced help necessary to conduct a purebred cattle breeding operation. Had petitioners conducted their new venture in a businesslike manner indicative of the presence of a profit motive, part-time, inexperienced *149 help to feed and water the cattle would not have been sufficient. In conclusion, based on all of the facts and circumstances, [31] we hold that petitioners' cattle breeding activities for the second half of 1978and thereafter do not constitute an activity engaged in for profit. Deduction of expenses generated by such activity is therefore limited by section 183. Decisions will be entered under Rule 155.
Footnotes
1. Approximately $22,576.58 of this amount relates to petitioners' cattle breeding activities and is in dispute. In their petition in docket No. 11187-81, petitioners agreed to immediate assessment and collection of the balance ($6,468) of the 1977 deficiency which was attributable to their treatment of insurance premiums.↩
2. Minor inconsistencies exist within the stipulation or between the stipulation and the record as a whole. For example, stipulation 17 states 12 head of cattle were purchased by petitioners in 1973 whereas stipulation 43 states 11 head were purchased. Similarly, stipulation 43, which identifies the cattle remaining after the May 1978 sale, is inconsistent with the trial testimony. None of these inconsistencies is critical to our decision.↩
3. Two separate petitions were filed: Docket No. 11187-81 for the 1977 tax year and docket No. 29871-82 for the years 1978 through 1980. Petitioners' motion for consolidation, which was not opposed by respondent, was granted on March 2, 1983. 4. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
5. The fact that, since about 1970, petitioners had posted the Camillus property with signs declaring it a "wildlife sanctuary" did not limit its use in a cattle operation.↩
6. Dell did not consult with any Angus association or organization before starting the d Six Angus Farms, nor did he personally solicit or receive any help from such an association or organization after his cattle operation was underway.
7. An open heifer is a cow under 3 years of age which has not produced a calf and whose reproductive capabilities, therefore, are unproven.↩
8. Due to significant losses incurred in his car dealerships between 1979 and 1982, Dell sold 3 dealerships in 1980 and 1 dealership in 1982. 9. Throughout this period 1973 through 1982, Mrs. Dell was employed as a secretary and executive of both the Sam Dell Dodge Corporation and the realty company. She did not take any active part in petitioners' cattle breeding operations.↩
10. Of the remaining 75 calves born during Miner's tenure, 11 died at or shortly after birth, 44 were sold as purebred registered animals, 19 were retained in the herd as replacement heifers and 1 made its way into the farm freezer.↩
11. The information required for registration is: The identity of the calf's sire and dam, by name and registration number; the name, sex, tattoo number (which is tattooed in both ears), and birthdate of the animal; and the name and address of the breeder and first owner. ↩
12. The Amercian Angus Association requires that participating members keep accurate and permanent records of: Chain numbers; ear tag numbers; breeding dates (by means of a breeding report); calving dates (by means of a calving report); tattoos; and production records for each cow (by means of cow production records).↩
13. Dell had not attended any purebred cattle shows or sales prior to starting his cattle operation but attended 3 between 1975 and 1978. He also visited 3 cattle operations. Miner visited 2 other cattle breeding operations, and attended 5 sales and 1 show.↩
14. No production sale (where buyers come to the farm and select and purchase purebred animals) was held during this period because it was essential to retain the higher quality cattle to develop the herd.↩
15. The 6 cows that had been artificially inseminated in 1977 were included in those sold. ↩
16. The physical deficiencies included: blindness in one eye (1 cow); bad hindquarter(s) and poor udders (2 cows); proneness to prolapsed uterus which makes ability to reproduce questionable (1 cow); off type (1 cow); and inbreeding (1 cow).↩
17. Nothing in the record indicates this was to be a commercial breeding operation and there is insufficient evidence to evaluate it as such. We conclude, therefore, that petitioners' second venture, like the first, was to be a purebred Angus cattle breeding operation. The fact that, after the trial, petitioners registered calves with the American Angus Association supports our conclusion. 18. Dell has made no projection or estimate of when petitioners may have the approximately 200-head desired. If the herd continues to double in size every 5 years, petitioners would have a 200-head herd by approximately 1998.↩
19. A portion of the reported losses since mid-1978 is attributable to the continuing depreciation defuctions of pre-1978 capital assets, other than cattle, as follows: ↩
1978 (6 months)
$6,198.50
1979
11,589.00
1980
9,375.00
1981
6,252.00
1982
3,758.00
20. For example, at trial Dell did not know his membership status in the American Angus Association, what information was required to register a purebred animal with the Association or how many bulls had been at the cattle operation since Miner's departure. 21. Prior to December 1980, the compensation of these men was free use of a barn apartment. The apartment was completed in 1977 by renovating an old barn on the Camillus property when petitioners purchased it. Although the apartment was intended to be used by Miner when he needed to be close to the herd, he never used it. It has been rented since December 1980 when Donald Bloeser was hired for $80 per week. ↩
22. The only record maintained by Bloeser was a pocket calendar on which he noted calves born during 1981 and 1982.↩
23. Petitioners have also kept records of rental income from the Whedon Road house, the barn apartment and leased crop land.↩
24. The record in this proceeding does not provide information from which the income from other sources for 1973 can be computed. 25. The proceeds from the liquidation sale were correctly reported on a Supplemental Schedule of Gains and Losses (Form 4797) rather than on Schedule F of petitioners' 1978 Federal income tax return. See footnote 27, infra.↩
26. Petitioners abandoned cultivation of the Camillus property for cattle feed in 1978 and these fields, as well as approximately 40 acres of the property acquired in 1980, were leased.↩
27. Relying on Rule 41(b), petitioners, on brief, asserted that a second issue in this proceeding is whether net farm losses for 1978 should be offset by the income from the liquidation cattle sale in determining the deficiency for that year. Citing sec. 1.183-1(b)(4), Income Tax Regs., petitioners argue that this income was derived from the sale of capital assets used in their cattle breeding activity and, therefore, should be included in the computation of net losses from that activity. Respondent maintains that these gains were properly reported as long-term capital gain on petitioners' 1978 Supplemental Schedule of Gains or Losses (Form 4797), that it would be inappropriate to offset petitioners' farm losses by such gain and that such offset would result in a distorted picture of petitioners' net farm losses for 1978. We agree with respondent. As discussed, infra, these proceeds represent income from the sale of capital assets at the termination of a business rather than income from an ongoing activity. Additionally, sec. 1.183-1(b)(4), Income Tax Regs.↩, on which petitioners rely, applies to determining the gross income of an activity "not engaged in for profit" and, based on our holding in this case, is inapplicable to the business which was terminated by the 1978 liquidation sale.
28. Respondent characterizes these 2 "businesses" as 2 obvious stages of the same business.↩
29. The parties agree that prior to 1973 petitioners had not engaged in any activity which was similar to purebred cattle breeding.
30. The fact that petitioners were able to ascertain sufficient information to register a few calves with the Association after conclusion of the hearings in this case does not undercut the need for detailed, contemporaneous records.
31. In evaluating petitioners' second cattle operation, we have considered petitioners' income from other sources and possible personal pleasure as discussed, supra,↩ concerning petitioners' first cattle business.