JOSEPH and FLORENCE FRAZIER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frazier v. Commissioner
Docket Nos. 25688-81, 2827-82.
United States Tax Court
T.C. Memo 1985-61; 1985 Tax Ct. Memo LEXIS 573; 49 T.C.M. (CCH) 715; T.C.M. (RIA) 85061; February 11, 1985. Bruce R. Wright, for the petitioners. Russell K. Stewart, for the respondent. SWIFT
*715 MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: By statutory notices of deficiency *575 dated July 15, 1981 (for 1971 through 1975), and November 17, 1981 (for 1976), respondent determined deficiencies in petitioners' Federal income tax liabilities as follows: Year
Deficiency
1971
$13,978
1972
32,439
1973
16,808
1974
49,071
1975
26,671
1976
14,199
*2 After concessions, the only issue for decision is whether petitioners operated their farm as an "activity * * * not engaged in for profit" within the meaning of section 183. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Joseph and Florence Frazier are husband and wife and resided in Lafayette Hills, Pennsylvania, at the time the petitions herein were filed. Petitioners timely filed their Federal income tax returns on a joint return basis for each of the years in issue. Joseph Frazier will hereinafter be referred to as "petitioner." In the late 1960's and early 1970's, petitioner was a well-known professional boxer. Petitioner's career reached its pinnacle in 1971 when, as *576 World Boxing Association heavyweight champion, he successfully defended his title against Muhammed Ali in what was advertised as "the fight of the century." Petitioner earned from that fight alone approximately $2 million gross. As a result of his boxing success, petitioner rose from a background of poverty to become a wealthy man. Petitioner was the youngest of Dolly and Ruben Frazier's nine children. The family was raised on a 10-acre farm in rural Laurel Bay, South Carolina. The 10 acres were acquired by petitioner's ancestors from a post-civil war reconstruction grant of land to former slaves. The three-bedroom house on the farm *3 was the home of the entire Frazier family and often an additional relative or two lived in the house. The house had neither running water nor indoor bathroom facilities. Petitioner's parents supported themselves and their family by farming the 10-acre Laurel Bay property. The family members also earned money by hiring themselves out as farm hands to the other farms and plantation properties in the vicinity of Laurel Bay. In particular, petitioner's mother, Dolly Frazier, has supported her immediate family by farming throughout her entire *577 adult life. Petitioner's ancestors also farmed the Laurel Bay property. Petitioner and educated through the ninth grade and spent much of his youth as a paid field-hand on neighboring farms. At age 15, petitioner left South Carolina for New York, and later Pennsylvania, with dreams of a successful boxing career. Having realized those dreams in 1971, petitioner desired to provide a means whereby he, his 64-year-old mother, and other members of his family could become more prosperous by farming a larger and better parcel of property. To this end, petitioner purchased a large farm property known as the "Brewton Plantation" in July, 1971. Brewton Plantation (hereinafter sometimes referred to as the "Brewton farm" or the "Brewton property") was a 365-acre farm located approximately 20 miles west of Beaufort, South Carolina, and approximately 15 miles from the 10-acre Laurel Bay farm owned by petitioner's family. The brewton farm was located within the *4 same general farming community in which petitioner, his mother, and other family members had worked as farm hands for many years. The Brewton farm, as purchased by petitioner is 1971, consisted of 165 tillable acres, 20 acres *578 of swampland, four houses and other barns or outbuildings.Petitioner paid $175,000 for the property. Prior to the purchase, petitioner was familiar with farms in the vicinity of the Brewton property as a result of his earlier work in that area. Although petitioner did not personally revisit and inspect the Brewton farm immediately prior to the purchase, his attorney did so at petitioner's request and expense. Before purchasing the farm, petitioner did not commission soil studies to be conducted, nor did he or his attorney consult with farm experts specifically to determine from them whether the Brewton farm could be operated profitably. The Brewton farm was in a state of general disrepair when petitioner purchased it in 1971, and apparently its buildings had not been occupied for several years. The farm's previous owner had leased approximately 100 acres of the property to a tenant farmer, Simon Jinks, from 1968 through 1970. Mr. Jinks' farming operations on the 100 acres were profitable, although his profits therefrom appear to have been partially attributable to efficiencies arising from the fact that he also farmed adjacent property and because he sold the produce from the *579 property directly to the public. Mr. Jinks continued to farm at a profit the land surrounding the Brewton farm during the years in issue, and he also raised cattle on some of the adjacent property. The *5 previous owner of the Brewton farm also had leased the farm's 200 acres of swampland to another individual for $16,000 to $17,000 per year, for use as a duck preserve by local hunters. Immediately after the purchase of the farm, petitioner spent two to three weeks on the farm repairing barns, corrals, and fences and fixing up the houses on the property. Dolly Frazier initially did not want to move to the Brewton farm because of her ties to the property at Laurel Bay, because she did not want assistance from her son, and because she felt unable to manage such a large parcel of property. Dolly acquiesced to petitioner's wishes, however, and moved to the Brewton farm in 1971. [2] Petitioner's sister, Flossie, also moved to the farm with her immediate family, and occupied a second house. Both Dolly and Flossie, and the immediate family members still at home, lived on the farm rent-free. The "main house" on the *580 Brewton farm was reserved for use by petitioners and their children. [3] That house usually was unoccupied, however, because petitioner and his immediate family visited the Brewton farm only a few weeks each year. While on the property petitioner spent most of his time working on farm improvements. He mended fences, worked in the fields, and made other repairs. *6 Throughout the years in question, neither petitioner nor any other member of his immediate family used the Brewton property for recreational or resort purposes. Respondent submitted as evidence two news articles written in 1972 which suggested, among other things, that petitioner purchased the property as a hunting retreat or vacation home. From the evidence in the record herein, however, it is clear that neither petitioner nor his mother considered the Brewton property as anything other than a working farm. Farm operations on the Brewton property were overseen by two full-time, salaried managers--John Young from 1971 through 1973, and John Green from 1973 through 1976. Both managers were related to petitioner but neither lived on the property. Over the *581 years, several field hanes were hired, some of whom also were related to petitioner. [4] Petitioner's mother personally worked on the Brewton farm property and assisted in most aspects of the farm operations. Financial records for the Brewton farm consistently were maintained in Philladelphia by petitioner's bookkeeper, Frances Meyers. Farm expenses were reported to Mrs. Meyers by the farm managers and were recorded in a double-entry Safeguard bookkeeping system. Mrs. Meyers also maintained detailed payroll records and withheld Federal and state taxes before issuing *7 checks to farm employees. Although the bookkeeping system established by Mrs. Meyers had procedures for reporting sales income from the farm, no sales were reported to her, apparently because the sales were so small and infrequent. Petitioners did report on their Federal income tax returns a total estimated farm income of $9,000 over *582 the five years from 1972 through 1976. Farm expenses ordinarily were paid from petitioner's business checking account in Philadelphia. Petitioner's understanding was that all farm profits would be shared equally with his mother, but that he alone would bear all tax liabilities with respect to the Brewton farm and be responsible for all farm losses. Throughout the years in issue, petitioner knew generally that the Brewton farm was not profitable, but he did not himself keep apprised of the financial details of the farm. From 1971 to 1976, several types of produce were planted on the Brewton farm, including tomatoes, cucumbers, corn, peas, beans, squash, wheat, and soybeans. The soil on the property consisted primarily of clay, covered by a thin layer of top soil; thus, farming was very difficult and resulted in low yields. Petitioner purchased two trucks and a tractor for use on the farm. Periodic trips were made into town by farm personnel in order to sell the farm produce, and some minor sales were in fact made. In general, however, the farm managers were unable to market the crops successfully. The lack of sales appears to have been significantly attributable to competition *583 from larger, more sophisticated farms. Three incidents illustrate some of *8 petitioner's difficulties, or (more accurately) illustrate petitioner's lack of sophistication in dealing with those difficulties. On one occasion, a wholesale buyer visited the farm and agreed to purchase several bushels of tomatoes. The tomatoes were picked, but the buyer never returned to purchase them. The tomatoes rotted and were fed to the animals. On another occasion, a farm worker took a truckload of tomatoes to a wholesale buyer in town, but the buyer declined to purchase the tomatoes because they were not the desired variety. Cucumbers were transported to town on still another occasion, but could not be sold due to a trucking strike. Petitioner decided that it might be profitable, due to rising beef prices, to raise cattle on the farm in addition to planting various crops. In March of 1974, petitioner personally discussed that prospect with Mr. Jinks. Upon Mr. Jinks' advice and with his assistance, petitioner personally purchased 50 to 60 head of cattle in South Carolina for $16,413.01. Petitioner purchased the livestock over a two-week period with three bank checks and placed the *584 cattle on the Brewton property. About nine months later, the cattle began to die for no apparent reason. At petitioner's request, petitioner's mother consulted with veterinarians who concluded that the deaths were caused by a rare parasite that had infested the water on the property from which the cattle had been drinking. Petitioner relocated the cattle to another part of the property, but most of *9 the cattle died as a result of the parasite disease. Due to continued losses, petitioner terminated all commercial farming and cattle raising activities on the Brewton property in 1976. In addition to the farming and cattle operations, petitioner at one point attempted to open a recreational facility on the farm for duck hunters, a use of the land that apparently had been profitable in prior years. The Brewton farm was located near a resort island, and public interest in the farm was heightened due to petitioner's celebrity status. Based on those factors, petitioner though that a duck preserve might turn out to be a profitable venture on the property. Again, a number of unforeseen difficulties were encountered. In order to establish the duck preserve, it was necessary *585 to flood a portion of the farm in addition to the swampland. The Brewton property had no watershed of its own for that purpose. Prior to petitioner's purchase of the property, a neighboring landowner had granted to the previous owner of the Brewton property free access to the watershed on his (the neighbor's) property. After petitioner acquired the property, however, that neighbor refused petitioner access to his water for use on the Brewton property. Petitioner investigated other means of securing sufficient water, and he sought and obtained advice in that regard from state agricultural representatives and from a local university extension service. Petitioner paid for a water canal to be dug on the Brewton property in an attempt to improve the watershed, *10 but further efforts to expand the canal system and other alternatives to improve the watershed were discarded due to excessive costs. Petitioner eventually abandoned efforts to establish a duck preserve on the property. The Brewton property appreciated in value during the years in issue and is currently valued at between $350,000 and $400,000. The property is still owned by petitioner today. Petitioner retired *586 from professional boxing in 1976 and presently owns and operates a gymnasium in Philadelphia, Pennsylvania, in which he trains young boxers. He also has invested profitably in real estate, and pursues a career in the entertainment field. During the years in issue petitioner deducted the following schedule F farm expenses with respect to the operation of the farming activities on the Brewton property: *11 REPORTED FARM EXPENSES 1971 - 1976 1971
1972
1973
1974
Labor hired
$ 6,382 $ 20,618 $ 19,345 $ 10,278 Repairs, maintenance
521 765 2,763 4,262 Interest
8,021 3,970 Feed purchased
1,265 2,527 Seed, plants purchased
12,540 2,165 Fertilizers
1,102 1,621 Machine Hire
34 Supplies purchased
874 14,553 790 6,930 Veterinary medicine
Gasoline, fuel, oil
540 835 Taxes
327 628 23 562 Insurance
6,204 1,737 1,589 Utilities
654 1,120 Telephone
1,366 2,655 Miscellaneous
1,892 7,141 Depreciation
-building
1,500 1,500 1,500 1,500 -machinery & other
5,267 5,267 2,326 2,326 TOTAL EXPENSES
$ (16,676)
$ (71,988)
$ (34,640)
$ (46,481)
REPORTED INCOME
(Estimated) 1,000 1,000 2,000 REPORTED LOSS
$ (16,676)
$ (70,988)
$ (33,640)
$ (44,481)
*587 1975
1976
TOTAL
Labor hired
$ 14,683 $ 10,149 $ 81,455 Repairs, maintenance
2,159 3,511 13,981 Interest
8,248 3,959 24,198 Feed purchased
5,823 9,615 Seed, plants purchased
3,846 18,551 Fertilizers
1,178 40 3,941 Machine Hire
452 54 540 Supplies purchased
2,257 1,443 26,847 Veterinary medicine
567 567 Gasoline, fuel, oil
1,361 1,573 4,309 Taxes
1,185 1,041 3,766 Insurance
1,573 11,103 Utilities
1,774 Telephone
1,465 5,486 Miscellaneous
98 186 9,317 Depreciation
-building
1,500 1,061 8,561 -machinery & other
2,326 2,098 19,610 TOTAL EXPENSES
$ (42,898)
$ (30,938)
$ (243,621)
REPORTED INCOME
(Estimated) 4,000 1,000 9,000 REPORTED LOSS
$ (38,898)
$ (29,938)
$ (234,621)
*12 The Federal income tax consequences to petitioners of the above deductions can be estimated in the following manner: Petitioners'
Estimated
Petitioners'
Federal
Federal
Federal Tax
Taxable
Income
Tax
Farm Losses
Savings As A %
Year
Income
Tax Paid
Rate
Deducted
Of Taxes Paid
1971
$ 607,526
$ 321,577
52.93%
$ 16,676
2.7%
1972
865,594
368,662
42.59%
70,988
8.2%
1973
325,836
120,875
37.09%
33,640
10.3%
1974
1,111,257
383,909
34.54%
44,481
4.0%
1975
1,744,234
618,403
35.45%
38,898
2.2%
1976
625,683
265,602
42.44%
29,938
4.7%
TOTAL
$5,280,130
$2,079,028
$234,621
4.4% Total
Estimated
Tax Savings
Over 6 years
*588 OPINION The issue for decision is whether the operation of petitioner's farm was an "activity * * * not engaged in for profit" within the meaning of section 183. [5]Section 183(a) *13 provides that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction [for expenses of losses] attributable to such activity shall be allowed" except as provided in section 183(b). Section 183(b)(1) permits deductions only for items that are allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) permits deductions for items that would be allowable if the activity were engaged in for profit, but only to the extent that gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). An "activity not engaged in for profit" is defined as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). *589 *14 If for any two of five consecutive taxable years the gross income derived from the activity exceeds the deductions attributable to such activity, section 183(d) provides a presumption that the activity is engaged in for profit. Petitioner's farm has never produced a profit, therefore that presumption is not in effect in this case. The test for determining whether an individual is carrying on a trade or business or is engaged in a transaction for the production of income, so that his expenses are deductible under sections 162 or 212, is whether the individual's primary purpose and intention in engaging in the activity is to make a profit. Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Although profit need not be the sole motive in undertaking or continuing an activity, it must be the predominant motive. *590 Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). The expectation of profit need not be reasonable; it is sufficient if there is an "actual and honest profit objective." Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 644-45 (1982), affd. without opinion (D.C. Cir. 1983); Lemmen v. Commissioner,supra at 1340; Golanty v. Commissioner,supra at 425-26. *15 In determining whether the requisite intention to make a profit exists we must look to objective standards and consider all the surrounding facts and circumstances of the case. Sec. 1.183-2(a), Income Tax Regs.; Faulconer v. Commissioner,     F.2d     (4th Cir., Nov. 26, 1984, 55 AFTR 2d 85-302, 84-2 USTC par. 9955), revg. and remanding a Memorandum Opinion of this Court; Churchman v. Commissioner,68 T.C. 696, 701 (1977). Among the relevant factors to consider are the following: (1) The manner in which the taxpayer carries on the *591 activity; (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, that are earned, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner,supra at 644. No one factor is determinative of the taxpayer's intention to make a profit, and certain factors may be given more weight than others because they are more meaningfully applied to the evidence in a particular case. Sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,supra at 426. [6]
*16 In applying the law to the facts of this case, we note at the outset that petitioners' witnesses, *592 particularly Dolly Frazier, were candid and forthright in their testimony, and highly credible in their recitation of the facts herein. After careful scrutiny of all of the evidence, including the testimony and exhibits presented, and the various objective factors, it is our conclusion that petitioner had the requisite intent to make the Brewton farm a profitable operation. Petitioner conducted operations at the farm in a relatively business-like manner. Petitioner's attorney investigated the farm prior to purchase. Petitioner hired individuals who he knew had farmed their entire adult lives to supervise the farm operation, and petitioner's bookkeeper kept complete and accurate financial records of farm operations. Upon realization of early losses, farm operations were modified consistent with an intent to improve profitability by planting different crops, by attempting to raise cattle, and by attempting to develop a duck preserve. When faced with repeated misfortune, petitioner sought and implemented advice from Mr. Jinks, an experienced and successful neighboring farmer, as well as from state and university agricultural experts. A significant portion of petitioner's losses *593 can be explained by a series of unfortunate events beyond his control. Losses attributable to such events are not an indication that petitioner lacked a profit motive. Sec. 1.183-2(b)(6), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 669 (1979). *17 Although petitioner spent little time at the farm, [7] the time he did spend there was devoted to physical labor to improve the farm, and neither petitioner nor members of his immediate family used the farm for recreational pursuits.The Seventh Circuit recently observed-- Common sense indicates to us that rational people do not perform hard manual labor for no reason, and if the possibility that petitioners performed these labors for pleasure is eliminated the only remaining motivation is profit. * * * We believe that the absence of any recreational purpose strongly counsels in favor of finding that petitioners' prodigious efforts were directed at making a profit. [Nickerson v. Commissioner,700 F.2d 402, 407 (7th Cir. 1983), revg. a Memorandum Opinion of this *594 Court.] After six years of unprofitable operations, [8] petitioner *18 abandoned his attempt to make the farm a profitable commercial enterprise. The termination of a "business before it could be expected to generate any profits does not retroactively negate the presence of the requisite profit motive." [9]
*595 Respondent argues that petitioner did not intend to derive a profit from the farm, but that he purchased the farm solely to provide a new home for his mother. Respondent further asserts that the manner of petitioner's operations made a profitable farm virtually impossible, and thus insured an unbroken string of losses over the six-year period. Respondent contends that those factors are indicative of petitioner's true motive, which was to reap substantial tax savings by operating the farm at a loss. *19 Respondent relies heavily on two newpaper articles which stated that petitioner purchased the farm solely as a home for his mother. We accord very little weight to those articles. News articles, in particular those pertaining to the lives of celebrities, often contain distortions of fact and report statements out of the context in which they were made. It is clear that petitioner intended that his mother live on the Brewton farm, and the expenses attributable to the homes occupied primarily as personal residences by his relatives are not deductible. Sec. 262. [10] It is important, however, to note that Dolly Frazier did not need a home at the Brewton farm because she *596 retained title to the old family home at Laurel Bay, was free to stay there, and would have prefrred to reside there. We are convinced that petitioner intended to improve the lives of his relatives by establishing them on a self sufficient, operating, and profitable farm, in the profits of which he would share. Profit motive is not negated simply because a taxpayer derives a sense of satisfaction in providing for relatives, friends, or loved ones. The fact that petitioner's mother and some of his other relatives lived on the farm does not establish that the farm was not operated with an intent to make a profit. In Faulconer v. Commisioner,supra, the court stated in the context of a family farm-- *20 The record does not show any recreational element involved in Faulconer's farming activity. The only personal element involved is that Faulconer lives on and works the family farm. We are of opinion this fact may not be held against the taxpayer, and whatever the personal elements may be as spoken of in the regulations, they do not include living and working on the family *597 farm. [Faulconer v. Commissioner,     F.2d    ,     (4th Cir., Nov. 26, 1984, 55 AFTR at 85-308, 84-2 USTC at 85,921).] Respondent correctly argues that substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors that bear on the taxpayer's true intent. Sec. 1.183-2(b)(6), Income Tax Regs.; Golanty v. Commissioner,supra at 426; Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Continued losses over an extended period of time that cannot be adequately explained will substantially weaken a taxpayer's position. Allen v. Commissioner,72 T.C. 28, 34 (1979). On the facts of this case, however, the period of time over which petitioner's losses arose is not unduly long and does not negate petitioner's intent to make a profit. We note that in Engdahl v. Commissioner,72 T.C. 659, 663 (1979), *598 deductions were allowed in spite of twelve straight years of losses in a horse breeding operation. In Allen v. Commissioner,supra at 30, a profit motive was found to be present in the face of twelve straight years of losses in the operation of a ski lodge. In Babbitt v. Commissioner,23 T.C. 850, 866 (1955), farm losses over twelve years did not cause the deductions to be disallosed. In Smith v. Commissioner,9 T.C. 1150, 1151 (1947), losses over eight years did not cause the *21 deductions to be disallowed. We noted in an early case that "if losses, or even repeated losses, were the only criteration by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale." Riker v. Commissioner,6 B.T.A. 890, 893 (1927). Furthermore, it is important to note that petitioner realized only a 4.4-percent estimated total tax savings as a result of the farm losses. Even if petitioner considered the possible tax advantages that might be realized on the farm from losses, such consideration is not inconsistent with a profit motive. Lemmen v. Commissioner,77 T.C. 1326, 1346 (1981). *599 We also are unpersuaded by respondent's assertion that the size of petitioner's farm operation precluded a profitable enterprise. Petitioner and his mother lacked experience in managing a large, commercial farm, and it is quite clear that their lack of experience exacerbated their problems and compounded their losses. It may have been unreasonable for petitioner to expect to reap profits from the Brewton farm, particularly in the early years, but the reasonableness of petitioner's expectation is not the focus of our inquiry. Indeed, when section 183 was drafted in 1969, the Conference Committee adopted a Senate amendment that eliminated a "reasonableness" requirement, and reported the following rationale: The committee is concerned * * * that requiring a taxpayer to have a "reasonable expectation" of profit may cause losses to be disallowed in situations where *22 an activity is being carried on as a business rather than as a hobby. * * * For example, it might be argued that there was not a "reasonable" expectation of profit in the case of bona fide inventor or a person who invests in a wildcat oil well. A similar argument might be made in the case of a poor person *600 engaged in what appears to be an inefficient farming operation.The committee does not believe that this provision should apply to these situations or that the House intended it to so apply, if the activity actually is engaged in for profit. [S. Rept. No. 552, 91st Cong., 1st Sess. 103 (1969), 1969-3 C.B. 489-90. Emphasis supplied.] Respondent argues that the above-quoted language is inapplicable to petitioner because he was not a "poor" person, but rather a person who had earned in excess of $5 million over the six years in controversy. Petitioner did possess substantial wealth and was able to absorb the farm's losses without lowering his standard of living. That factor alone, however, is not indicative of a lack of profit motive. Engdahl v. Commissioner,supra at 670. On balance, we are convinced that petitioner fully intended that his family operate the farm in a profitable manner. Petitioner's family had earned their livelihood, although meager, from farming for generations. Rather than walk away from that way of life after achieving a successful boxing career, petitioner continued to participate in farming, although physically removed *601 therefrom, with his funds and at his risk. It is our opinion that the losses more accurately are explained in *23 terms of an inefficient farming operation, and hindsight should not cause us to substitute our judgment for that of a taxpayer who, with his funds, "gave it a try." [11]
Petitioner deducted certain depreciation expenses with respect to "building" situated on the Brewton property. Petitioner's relatives clearly occupied two of the farm houses as personal residences, and petitioner has not established any business purpose for such occupancy. Therefore, depreciation expenses claimed that are attributable to the farm houses are not deductible. Sec. 1.262-1(b)(3), Income Tax Regs.; see Sapp v. Commissioner,36 T.C. 852 (1961), affd. per curiam 309 F.2d 143 (5th Cir. 1962); International Artists, Ltd. v. Commissioner,55 T.C. 94 (1970). Because petitioner has failed to allocate the claimed depreciation expenses between the buildings used as personal residences and buildings used in the conduct of the farming operation, *602 we disallow all depreciation expenses claimed by petitioner with respect to farm "buildings" in years 1971 through 1976. As to all other deductions, we hold for petitioners. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in controversy.↩
2. Petitioner's father, Ruben Frazier, died in 1965.↩
3. The fourth house on the farm was unoccupied.↩
4. Payroll records kept with respect to farm employees indicate that of the 26 farm employees hired from 1971 to 1976, at least 10 were related to petitioner and 11 were not related. The record does not indicate whether the remaining 5 were related to either petitioner.↩
5. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. (d) Presumption.--If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.↩
6. See also Zuckerman v. Commissioner,T.C. Memo. 1984-192↩.
7. Section 1.183-2(b)(3), Income Tax Regs., provides-- The fact that the taxpayer devoted a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.↩
8. The farm did appreciate in value from $175,000 in 1971 to at least $350,000 in 1984. We agree with respondent, however, that under the authority of sec. 1.183-1(d)(1), Income Tax Regs., we must consider the holding of the land for its appreciation in value and the farming of the land as separate activities. Thus, we do not consider the appreciation of the land as a factor in determining whether the farm was an activity engaged in for profit. See Boddy v. Commissioner,T.C. Memo. 1984-156, n.6; Olive v. Commissioner,T.C. Memo. 1983-195. In determining whether the farming of land and the holding of land for appreciation constitute a single activity or separate activities, all the facts and circumstances of the case must be considered. Section 1.183-1(d)(1), Income Tax Regs., provides specific guidance, however, for cases in which the taxpayer the taxpayer engages in farming, as follows: Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land). Because the Frazier farm generated income insufficient to cover the deductions directly attributable thereto, the farming and the holding of the land must be considered separate activities.↩
9. Dell v. Commissioner,T.C. Memo 1984-556, 48 T.C.M. 1430↩, 1437; 53 P-H Memo T.C. par. 84,556 at 2264-84, 84-2271.
10. Hambleton v. Commissioner,T.C. Memo. 1982-234↩.
11. See Fisher v. Commissioner,T.C. Memo. 1980-183↩.